954 A.2d 470

## WESTBARD APARTMENTS, LLC et al.

v.

## WESTWOOD JOINT VENTURE, LLC et al.

### No. 1471 Sept. Term, 2006.

Court of Special Appeals of Maryland.

May 25, 2007.

Reconsideration Granted in Part Sept. 9, 2008.[*]

---

[*] Reconsideration was addressed in an unreported opinion, Case No. 1471—2006 Term.

38

Jerrold J. Ganzfried (Robert L. Green, Jr., Robert H. Cox, Howrey, LLP, on the brief), Washington, DC; William C. Davis, III, Shulman, Rogers, Gandal, Pordy & Ecker, PA, on the brief, Rockville, MD, for Appellant.

Paul J. Kierman, Washington, DC and Joel A. Kozol (Lee H. Kozol, David M. Kozol, Friedman & Atherton, LLP, Boston, MA, on the brief); J. Bradford McCullough, Lerch, Early & Brewer, Chtd., on the brief, Bethesda, MD, for Appellees.

Panel: DAVIS, SALMON and ADKINS, JJ.

DAVIS, Judge.

This controversy emanates from the sale of forty acres of land in Bethesda, Maryland by appellee, Westwood Joint Venture LLC (Westwood). Appellant, Westbard Apartments LLC (Westbard or Apartments), a Delaware Limited Liability Company, and Westwood were parties to a lease (the Lease) of one of nine parcels (Park Bethesda) wherein Westbard was granted several rights, including the right of first refusal[1] to buy Park Bethesda, the right to buy Park Bethesda for $35 million in 2022, the right of first offer[2] to buy other parcels and the right of co-development. Westwood owned nine parcels of land including Park Bethesda, which was rented to Westbard in December 1999 by then-owner Laszlo N. Tauber.

Richard Cohen expressed interest in the purchase of parcels for residential development when the Lease was initially negotiated. However, Tauber assured Cohen that he had no interest in developing the remaining parcels; thus, Section 13.4 of the Lease secured the right of first offer in the event Tauber decided to sell or otherwise dispose of any of the parcels for residential development to a third party. The Lease was for a ninety-nine year period. Cohen entered protracted negotiations with Tim Durkin,[3] an employee of National Electrical Benefit Fund (NEBF), in 2000 to enter into a joint venture to develop Park Bethesda. NEBF is a multi-billion dollar pension fund administered by two trustees who must approve any new investments. Notwithstanding Cohen's desire to move quickly, the NEBF trustees' approval process was lengthy and involved numerous steps culminating

---

1. Section 13.2 of the Lease granted the right of first refusal should Park Bethesda be sold to a third party. Under Section 13.3 the right to develop additional land was reserved to the landlord, Laszlo Tauber (Tauber), with Cohen granted co-development rights should Tauber have elected to co-develop the property.

2. Section 13.4 of the Lease.

3. Durkin died unexpectedly in June 2004.

in the creation of Westbard's Operating Agreement (the Agreement).[4]

Westbard is a joint venture between NEBF and Westbard Investments LLC (Investments). Westbard's sole purpose is to invest in and develop the project Park Bethesda or the land and improvements also known as Parcel C of Westwood. Investments, owned and controlled by Cohen, is also the Managing Member of Westbard and holds fiduciary positions of responsibility according to the Agreement. Cohen has been a real estate developer since 1969 and has holdings in numerous states primarily concentrated on the East Coast.

In response to the land purchase, appellants Westbard and NEBF filed a complaint in the Circuit Court for Montgomery County on February 17, 2005 against Westwood, and another, on February 22, 2005, naming Cohen, Investments and CAP Acquisition LLC (CAP Acquisition) as defendants.

The actions were consolidated and appellants filed a second amended complaint on April 15, 2005, naming Westwood, Cohen, Investments, Cap Acquisition and six other Cohen-controlled entities[5] as defendants. The Second Amended Complaint for Injunctive Relief and Damages contained seventeen counts. Counts I through V, XIV and XV were derivative allegations by NEBF on behalf of Westbard against Westwood for declaratory judgments (Counts I and II), breaches of contract (Counts III and IV), breach of implied covenant of good faith and fair dealing (Count V), fraud (Count XIV) and negligent misrepresentation (Count XV). Appellants asserted Counts VI through IX against Investments for declaratory judgment (Count VI), breach of contract

---

**4.** The First Amended and Restated Limited Liability Agreement of Westbard Apartments LLC, A Delaware Limited Liability Company, was executed on April 18, 2001.

**5.** CAP–Park Bethesda LLC (CAP–PB), CAP–Westwood Towers LLC (CAP–WT), 360–Westwood Center II LLC (360–LLC), Westwood Shopping Center LLC (WSC) and WB CAP Westwood Properties LLC (WB CAP) (collectively either "Cohen-controlled entities" or "Cohen Defendants.") Capital Properties (Cap Properties) was also Cohen-controlled.

(Count VII), breach of the implied covenant of good faith and fair dealing (Count VIII) and breach of fiduciary duty (Count IX). Counts X through XII were asserted by appellants against Cohen for breach of contract/guaranty (Count X), breach of fiduciary duty (Count XI) and declaratory judgment (Count II). Count XIII was a derivative allegation by West-bard against Cohen and the Cohen-controlled entities for tortious interference with a contract. Count XVI was an unjust enrichment claim by appellants against the Cohen-controlled entities. Count XVII was a civil conspiracy count against all defendants.

Pursuant to the Delaware Limited Liability Company Act, Del.Code Ann. tit. 6, §§ 18–1001 to 1004, appellants sought specific performance, monetary damages, a declaratory judgment and injunctive relief and, to the extent permitted by law, they demanded a jury trial. The circuit court granted appellees' motions to strike appellants' demands for a jury trial on January 26, 2006 and subsequently granted summary judgment to Westwood on May 22, 2006. The circuit court denied the Cohen Defendants' Motion for Summary Judgment and a bench trial commenced on June 5, 2006. During the trial, the court granted the Cohen Defendants' motion for judgment as to civil conspiracy, declaratory judgment against Investments, breach of implied covenant of good faith and fair dealing against Investments and declaratory judgment against Cohen.[6]

Subsequent to the trial's conclusion on June 19, 2006, the trial court entered judgment on July 27, 2006 in favor of the Cohen Defendants on all other counts. Appellants noted this timely appeal and present the following issues for our review:

I. Whether the circuit court erred in dismissing [appellants'] jury demand, where claims for money damages presented questions as to which the right to trial by jury is protected by the Maryland Constitution.

---

**6.** Counts seventeen, six, eight and twelve, respectively.

II. Whether the circuit court erred in determining that, in the absence of language in the Operating Agreement clearly and unambiguously relaxing fiduciary duties, the Cohen Defendants did not breach any contract or fiduciary duty in purchasing the Westwood Complex to the exclusion and detriment of [Westbard] and NEBF?

III. Whether the circuit court erred in granting Westwood's [M]otion for [S]ummary [J]udgment on all counts?

## FACTUAL AND PROCEDURAL BACKGROUND

Tauber died on July 28, 2002 and his son, Alfred Tauber (Alfred), decided to sell the nine parcels of land that made up the forty acres of the Westwood Complex (Complex), including Park Bethesda. The Complex contained a 1950's era strip shopping center (Westbard Shopping Center), a retail/office building (Westwood Center II), a bowling alley (Strike Bethesda), two apartment buildings (Park Bethesda and Westwood Towers), two gas stations (Citgo and Texaco), and a retirement community (Manor Care). Alfred engaged Eastdil Realty Company, LLC (Eastdil) as the broker representing the interest of Westwood. In November 2003, Cohen and NEBF began discussions about exercising the rights contained in the Lease to purchase the Complex.

As noted, Westbard is a Delaware Limited Liability Company that has two members, NEBF and Investments. Cohen controls Investments and Investments is the "Managing Member" of Westbard. Cohen also provided a personal guaranty of Investments' fiduciary duties to NEBF ("Cohen Guaranty" or "Guaranty"). Cohen is the designated representative to speak, bind and act on behalf of Investments. The Agreement states in section 5.1.3:

The Managing Member[7] shall exercise the power and authority granted it under this Agreement and shall per-

In the Agreement, Managing Member "means [Investments], and any [oth]er Person admitted as or who shall become a managing member of [the] Company pursuant to the terms of this Agreement, and their [per]mitted successors."

form its duties as Managing Member under this Agreement in good faith, in a manner the Managing Member reasonably believes to be in the best interests of the Company,[8] and with such care as a prudent real estate professional in a like position would use under similar circumstances. The Managing Member acknowledges to and agrees with each of the Company and the other members that it is undertaking fiduciary duties and responsibilities to the Company and each of its Members identical to those a general partner undertakes to a limited partnership and its limited partners under the status and case law of the State of Delaware applicable to a limited partnership form of business organization.

The Agreement continues in section 5.1.4:

The Managing Member shall be required to manage the Company as its sole and exclusive function and shall not have any other business interests or engage in activities other than those relating to the Company; *provided*, however, that each other Member (and its partners, shareholders, members or Affiliates) may have other business interests and may engage in other activities in addition to those relating to the Company, including the making or management of other investments. Neither the Company nor any Member shall have any right, by virtue of this Agreement or the Company created hereby, in or to such other ventures or activities or the income or proceeds derived from unrelated activities of the other Members or their Affiliates. Each Member hereby Consents to the pursuit of such ventures by the other Members (other than the Managing Member, but not Affiliates of the Managing Member), even if competitive with the business of the Company, and acknowledges that such ventures shall not be deemed wrongful or improper. Except as otherwise expressly provided in this Agreement or in any other written agreement between the Members, no Member or any Affiliate of a Member shall be obligated to present any particular investment opportuni-

8. Defined in the Agreement as "Westbard Apartments LLC."

ty to the Company even if such opportunity is of a character which, if presented to the Company, could be taken by the Company; and each Member and each Affiliate of a Member shall have the right to take for its own account, or to recommend to others, any such particular investment opportunity.

By the summer of 2004, Alfred Tauber had concluded that the sale of the Complex to a holder of the rights contained in the Lease was preferable to a third party because it avoided complications of overlapping rights. On October 1, 2004, after consultation with NEBF's Managing Director for Real Estate, Jeff Kanne, Cohen contacted Eastdil and offered $110 million for the Complex. Upon receiving a favorable response from Eastdil, Cohen related to Kanne that "we got it for 110." On October 6, 2004, Cohen faxed to NEBF a copy of his Letter of Intent that indicated that Capital Properties, Cohen's entity, would purchase the Complex. NEBF did not object.

In the process of finalizing the deal, Cohen waived any claims Westbard might assert based upon Westbard's right of first refusal and also obtained the right to allocate the aggregate purchase price among the various parcels. On November 8, 2004, Westwood and Cap Acquisition signed a purchase and sale agreement (P & S Agreement) for the Complex in its entirety in which $18 million was allocated as the purchase price of Park Bethesda.

The P & S Agreement contained language that prevented Westbard from exercising its right of first offer, stating that "Seller and Purchaser agree that there is no intention at this time to develop or re-develop any property into a residential use and each Deed shall contain a provision stating that the applicable Property is being conveyed and accepted subject to all easements, conditions and restrictions of record."

Cohen and NEBF failed to agree on terms for a new joint venture to purchase the Complex. On December 9, 2004, Cohen informed NEBF that he believed the Agreement permitted him to pursue the transactions in his individual capacity and that he intended to do so. On January 18, 2005,

Westwood entered into a Second Amendment to the P & S Agreement with CAP Acquisition that, in part, increased the allocation of Park Bethesda from $18 million to $29 million. That same day, Westwood notified NEBF by letter that it had received a bonafide offer from a third party of $29 million for Park Bethesda. Thereafter, NEBF and Westbard filed the complaints that were consolidated and are now the subject of the instant appeal.

Westwood moved to strike the jury demand, contending that § 20.17[9] of its lease with Westbard waived the right to jury trial and the Cohen Defendants moved for similar relief, relying on § 10.4[10] of the Agreement. The trial court found that Westbard's waiver of jury trial against Westwood applied to claims brought derivatively by others.

Subsequently, the trial court entered summary judgment in favor of Westwood and denied Cohen's Motion for Summary Judgment. The court dismissed all claims and, with respect to the breach of contract, good faith and fair dealing claims related to the right of first refusal under § 13.2 of the Lease, it found that, in the absence of an agreement between Cohen

---

**9.** Section 20.17 provides:

*Waiver of Jury Trial.* Landlord and Tenant waive trial by jury in any action or proceeding brought by either of them against the other or on any claim, cross-claim or counterclaim in respect thereof on any matters whatsoever arising out of, or in any way connected with, this Lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of the Leased Premises, and/or any claim, injury or damage under or in connection with this Lease.

**10.** Section 10.4 of the Agreement provides in pertinent part:

*Submission to Jurisdiction.* Each of [Westbard], [Investments], and the shareholders, partners, members, officers or trustees of the members, partners or shareholders of [Investments] hereby and irrevocably and unconditionally: (i) submits for itself and its property in any legal action or proceeding relating to this Agreement or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of the courts of the State of Maryland, ... the State of Delaware, and ... (ii) consents that any such action or proceeding may be brought in such courts and waives trial by jury. . . .

and NEBF with respect to the acquisition of the property, Westbard was unable to exercise its rights.

Beginning with the May 22, 2006 Order, the court found that section 5.1.4 of the Agreement was "ambiguous as to the extent to which it modifies the parties' fiduciary duties, in particular, whether it allowed the managing member to compete directly with [Westbard] in the conduct of its business activities."

After the conclusion of the bench trial, the court ruled on July 27, 2006 that, "insofar as whether [section 5.1.4] permits direct as opposed to indirect competition, § 5.1.4 is ambiguous." The court found that NEBF encouraged Cohen's conduct because NEBF could not "chase the deal," and, thus, NEBF allowed Cohen to "chase the deal" and if he was successful, NEBF could then decide whether to participate in the acquisition. The court found that, "having encouraged Cohen's conduct, NEBF cannot now complain about such conduct."

The language added to the P & S Agreement was found by the trial court to have been inserted with Kanne's knowledge and without objection. As additional grounds, the court found that the rights of first offer under § 13.4 of the Lease were not triggered by the sale because Westwood did not sell the property to be developed for residential housing. The court found that application of the right was triggered only in the event that the "seller intend[ed] that the property be developed for residential use."

Finally, the court ruled that Cohen reasonably set the value of Park Bethesda because the development rights were valued at $10 million and the property was valued at $22–24 million. In addition to Cohen's attempt to explain to NEBF how he arrived at the figure, the court found credible the testimony by Edward Saxe, Esquire that Cohen also offered to submit the question of value to a neutral expert, but that appellants rejected that offer. Additional facts will be provided as warranted.

## STANDARD OF REVIEW

Pursuant to the Maryland Rules,

[w]hen an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

Md. Rule 8–131(c) (2007).[11] We review the findings of fact of the trial court, not to determine whether its findings were correct, but whether, by a preponderance of the evidence, its conclusions were supported by the evidence adduced at trial. *Urban Site Venture II Ltd. P'ship v. Levering Assocs. Ltd. P'ship,* 340 Md. 223, 230, 665 A.2d 1062 (1995) (citing *State Ins. Comm'r v. Nat'l Bureau of Cas. Underwriters,* 248 Md. 292, 305, 236 A.2d 282 (1967)). The deference shown to the trial court's findings as to evidentiary rulings does not apply to its conclusions of law. *Nesbit v. GEICO,* 382 Md. 65, 72, 854 A.2d 879 (2004). Where the order "involves an interpretation and application of Maryland statutory and case law, [the appellate court] must determine whether the lower court's conclusions are legally correct under a *de novo* standard of review." *Id.* (quoting *Walter v. Gunter,* 367 Md. 386, 392, 788 A.2d 609 (2002)) (quotations omitted).

## LEGAL ANALYSIS

The Agreement is subject to the Delaware law because section 10.6 provides that "[t]his Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without regard to conflicts of law."

Appellants contend that Cohen, in derogation of his fiduciary duties to and to the exclusion of appellants, use Westbard's right of first refusal and right of first offer to acquire West-

---

**11.** Unless otherwise indicated, all reference to the Maryland Rules are to Replacement Volumes I and II (2007).

wood for himself and the entities he controlled, the Cohen-controlled entities, *supra.*

### Jury Trial

Appellants initially assign error to the trial court's finding that they waived their right to a jury trial as guaranteed by the United States and Maryland constitutions because legal claims were asserted to money damages. Appellants continue that, because Counts XIII and XVII were brought against Cohen-controlled entities that were in no way part of the Agreement or Lease, the Cohen-controlled entities could be neither bound by the contracts between Westwood and appellants, nor derive any benefits therefrom. Similarly, contend appellants, because NEBF was not a party to the Lease, the jury trial waiver does not apply to NEBF's civil conspiracy claim against Westwood.

According to appellants, the alternative arguments advanced by appellees, *i.e.,* that equitable claims are outside of the right to trial by jury, were not relied upon by the court and are without merit. Further, appellants contend that equally without merit is appellees' assertion that any legal claims are outweighed by equitable claims and, thus, do not require a jury because factual disputes on legal claims are still tried to a jury and must precede a bench trial at which equitable issues are resolved.

The circuit court granted defendants' motions, striking the jury demand as to all claims against all defendants, ruling:

> THE COURT: Okay. It seems to me from a reading of the pleadings that have been filed, and from listening to the arguments of counsel here at the hearing, the defendants are correct. I think in each instance the claims that are asserted by the plaintiffs basically derive from their relationship to the tenants. The tenants had waived in their contracts the right to trial by jury, which they acknowledge. And I think that to the extent that the plaintiffs' claim derives strictly from that relationship, that they also have waived the claim to trial by jury.

In the alternative, to the extent that the claims seek specific performance relief, it's equitable relief, which would not be triable to the jury.

If you assumed for the sake of argument that you could incorporate the claim for general damages under count 6 into count 17, and so it was a claim for money damages, not specific performance, it would still be barred because of the fact that the claim derives from the plaintiffs' relationship to the tenant. And the tenant, by entering into the agreement with the defendant, had waived their trial by jury.

With respect to the claim about the tortious interference and the fact that defendant, one of the defendants isn't party to the agreement, perhaps if the defendant wanted to demand trial by jury because they hadn't been a party to the agreement, the defendant might have been able to do that. But the fact that the defendant wasn't a party to the agreement doesn't allow the plaintiff, who was either a party to the agreement or derives their standing from the fact of their relationship to the party to the agreement, does not give, in my view, the plaintiff a right to demand trial by jury.

So the demand for trial by jury as to those counts is stricken.

 The right to trial by jury can be contractually waived. *Anne Arundel County v. Fraternal Order of Anne Arundel Detention Officers & Pers.*, 313 Md. 98, 109, 543 A.2d 841 (1988) (quoting *Park Constr. Co. v. Indep. School Dist. No. 32*, 209 Minn. 182, 296 N.W. 475, 477 (1941) (stating that, in arbitration agreements, "[s]uch waiver may be the result of contract or unilateral action")). Analogous to an agreement to arbitrate, the Lease and Agreement contractually provide for waiver of trial by jury.

Appellants' reliance on *Curtis G. Testerman Co. v. Buck*, 340 Md. 569, 667 A.2d 649 (1995) for the proposition that not all defendants were bound by the contracts and, thus, cannot derive benefits, rights or privileges from them is an attempt to insulate defendants and NEBF from the waiver contained in

section 20.17 of the Lease. In *Testerman,* the Court held that "[t]he rule is clear, however, that an officer is not personally liable on an agreement when there is no evidence in the record that the officer intended to assume the obligation." *Id.* at 578, 667 A.2d 649 (emphasis omitted). The instant case is inapposite.

NEBF is a member of Westbard and Westbard was bound by the Agreement and Lease provisions. There was never any intention of NEBF not to assume benefits, rights or privileges of the Lease. NEBF brought its action as a derivative action and, thus, on behalf of Westbard. We have held that a third-party beneficiary who sued for breach of a contract to which it was not a signatory was bound by the arbitration clause contained therein. *District Moving & Storage v. Gardiner & Gardiner,* 63 Md.App. 96, 105, 492 A.2d 319 (1985). Thus, NEBF cannot derivatively bring suit on behalf of Westbard as a member entity and simultaneously disclaim provisions in the Lease by which Westbard is bound.

We are persuaded by the Eleventh Circuit Court of Appeals which held that the non-signatories of an applicable arbitration contract were entitled to enforce its provisions under two circumstances of equitable estoppel. The Court, in *MS Dealer Serv. Corp. v. Franklin,* 177 F.3d 942 (11th Cir.1999), held:

> First, equitable estoppel applies when the signatory to a written agreement containing an arbitration clause "must rely on the terms of the written agreement in asserting [its] claims" against the nonsignatory [sic]. When each of a signatory's claims against a nonsignatory [sic] "makes reference to" or "presumes the existence of" the written agreement, the signatory's claims "arise ... out of and relate ... directly to the [written] agreement," and arbitration is appropriate. Second, "application of equitable estoppel is warranted ... when the signatory [to the contract containing the arbitration clause] raises allegations of ... substantially interdependent and concerted misconduct by both the nonsignatory [sic] and one or more of the signatories to the contract." Otherwise, "the arbitration proceedings [between the two signatories] would be rendered meaningless

and the federal policy in favor of arbitration effectively thwarted."

Id. at 947 (internal citations omitted) (alterations in original).

In *MS Dealer*, the arbitration clause at issue was incorporated by reference into the agreement signed between one original signor and Franklin. *Id.* The *MS Dealer* Court held that it must scrutinize the claims to find if they fell within the scope of the arbitration clause contained in the first agreement. *Id.* Because each of Franklin's claims made reference to and presumed the existence of the original agreement and her claims depended entirely on the contract, it gave rise to equitable estoppel. *Id.* at 948.

Similarly, appellants rely on the Lease and the Agreement to bring the instant matter. Thus, the Court did not err in finding that appellants "who [were] either a party to the agreement or derives ... standing from the fact of their relationship to the party to the agreement, does not give ... the [appellants] a right to demand trial by jury."

## Self–Dealing

Appellants contend that the threshold issue, made clear in the trial court's opinion and order, is whether the parties contractually removed the bar against self-dealing that a fiduciary is duty bound to protect. The trial court erred, according to appellants, because the record is devoid of any such clear and unambiguous provision and the court on three separate occasions determined that the crucial provisions, §§ 5.1.3 and 5.1.4, were ambiguous. That ambiguity, according to appellants, proscribes any modification of the statutory fiduciary duties because any relaxation of a general partner's fiduciary duties must be clear and unambiguous.

Appellants construe fiduciary duties from the Agreement that prohibited Investments and Cohen from competing against Westbard in the purchase of the Complex because Section 5.4[12] of the Agreement assigns personal liability to the

---

12. The section provides in pertinent part that: "[u]nless otherwise provided herein, the liability of any Member or Affiliate of any Member

Managing Member and Section 2.6 designates Cohen as the representative of Investments.[13]

The Agreement provides that Investments, as the Managing Member, owes the fiduciary duty that a "general partner undertakes to a limited partnership and its limited partners under the statutes and case law of the State of Delaware applicable to a limited partnership form of business organization."

 Under Delaware law, "[i]t is well settled that, unless limited by the limited partnership agreement, the general partner of a Delaware limited partnership ... like the directors of a Delaware corporation, have the fiduciary duty to manage the partnership in the partnership's interests and the interests of the limited partners." *Wallace ex rel. Cencom Cable Income Partners II, L.P. v. Wood,* 752 A.2d 1175, 1182 (Del.Ch.1999) (internal citation omitted). "[A] limited partnership agreement may provide for contractually created fiduciary duties substantially mirroring traditional fiduciary duties that apply in the corporation law." *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.,* 817 A.2d 160, 163–64 (Del. 2002); *see also Boxer v. Husky Oil Co.,* 429 A.2d 995, 997 (Del.Ch.1981) (stating that, under statute and common law, a general partner in a limited partnership is generally required "to exercise the utmost good faith, fairness, and loyalty," like that of a corporate director).

 If the agreement does provide for fiduciary duties, the agreement, as a contract, provides the standard for determining whether the general partner breached his fiduciary duty to the partnership. *Gotham,* 817 A.2d at 171. Where

---

to any other Member ... shall be limited to such Member's Interest in the Company; *provided,* however, ... the Managing Member (and any guarantor who may agree to be subject to any or all of the provisions of this *Section 5.4*) shall be personally liable."

**13.** The section authorized Cohen to "singly, and without inquiry being made by the other Members or the Company, to speak, bind and act on behalf of such Member with respect to matters involving the Company and such Member's Interest in the Company." The Company and any other members could rely on the designation until revoked or altered by written designation.

members of an LLC have made plain their intention by limiting, diminishing, restricting or modifying fiduciary duties by contract, the traditional fiduciary duties may be altered. *Gelfman v. Weeden Investors, L.P.*, 859 A.2d 89, 117 (Del.Ch. 2004) (stating that Delaware law requires "that any restriction on the fiduciary duties of a general partner be stated clearly in the partnership agreement and that the general partner comply with the substitute contractual standard of conduct as a prerequisite to taking advantage of the contractual alleviation of his fiduciary duties"). "[U]nder Delaware law, while partners are free to limit their fiduciary duties by contract, the parties to a limited partnership must make plain their intention to do so. *Werner v. Miller Technology Management, L.P.*, 831 A.2d 318, 333 (Del.Ch.2003). Where there is no clear contractual language that preempts default fiduciary duty rules, the courts of [Delaware] will continue to apply them." *Id.*

 Although, the terms of the Agreement authorize NEBF and Cohen to modify the default statutory duties by contractual agreement, they are nonetheless bound by the plain language of such terms in the absence of any ambiguity. We perceive, from our reading of § 5.1.4, no such ambiguity.

In the instant case, Cohen and NEBF were sophisticated real estate developers who entered into protracted negotiations culminating in the Agreement. The Agreement sections at issue clearly define the fiduciary duties that members owe one another and allow each to pursue opportunities unrelated to Park Bethesda.

Appellants argue that the activities engaged in by Cohen were a breach of his altered fiduciary duties because they were related to the development of Park Bethesda. Appellants argue that the contract must be read as a whole and, if Cohen or the Cohen-controlled entities were allowed to pursue related ventures, then section 5.1.3 would be nullified. We agree. The rights of first refusal and first offer were negotiated by Cohen and Laszlo Tauber to ensure that the latter would not develop residential units absent Cohen's, now West-

bard's, opportunity to join such an effort. Notwithstanding Cohen's efforts to ensure that he and his affiliates have "absolute freedom," they were clearly prohibited by the terms of the Agreement from their exercise of the right of first refusal as to the Park Bethesda property without the participation of NEBF.

Section 5.13 of the Agreement provided that, if the opportunity arose, Westbard would purchase the land and improvements of Park Bethesda if "all the Members agree to such purchase" and that the mortgage would merge the leasehold and fee simple estates subject to the consent of NEBF.[14] Investments was to endeavor to secure financing for such a purchase and the Members were to "reasonably consent" to provide Capital Contribution as set forth in section 3.4. Thus, both NEBF and Investments could withhold consent as to the purchase of Park Bethesda, but neither could singly purchase that property without the other.

As set forth, *supra,* Section 5.1.4 provides that the Managing Member, Westbard, was obliged to restrict its business interests and activities to the management of the Company "as its sole and exclusive function" and refrain from engaging in any other business interests or activities "other than those relating to the Company." Of particular note to our analysis, each other Member of Westbard, its partners, shareholders, members or Affiliates, however, were permitted, under Section 5.1.4, to "have other business interests and engage in *other activities in addition to those relating to the Company,* including the making or management of other investments." To afford maximum flexibility for the members to take advantage of investment opportunities "other than those relating to the Company," Section 5.1.4 expressly provided that neither the Company nor any Member shall have any right "in or to such other ventures or activities or the income or proceeds

---

**14.** Consent was defined in 1.23 of the Agreement as "prior written consent or approval of a member ... which consent or approval may be granted or withheld in such Member's sole and absolute discretion unless expressly stated otherwise. If the term 'Reasonable Consent' is used, such consent must not be unreasonably withheld or delayed."

derived from unrelated activities of the other Members or their Affiliates."

The members, by signing on to the Agreement, consented to permit the other members to pursue ventures "other than those relating to the Company," while granting the right to Affiliates of the Managing Member to pursue the aforementioned ventures even if competitive with the business of the Company. Section 5.1.4 expressly prohibited the Managing Member from engaging in such activities. Finally, the Members and their Affiliates are absolved, under this Section, of any obligation to present "any particular investment opportunity" to the Company and permitted to take advantage of such opportunity "for its own account" or recommend the opportunity to others.

Notwithstanding that we must consider the Agreement as a whole, a fair reading of Section 5.1.4 leads us to the ineluctable conclusion that, despite the wide latitude afforded the affiliates to pursue investment opportunities, the Section unambiguously confines such pursuits to ventures *other than those relating to the Company."* Park Bethesda was a "business interest" related to the company and did not qualify as an "other venture or activity." Cohen's arrogation of the opportunity to purchase Park Bethesda unto himself was in contravention of Section 5.1.4. The trial court, therefore, erred in ruling that, "insofar as whether [Section 5.1.4.] permits direct as opposed to indirect competition, § 5.1.4. is ambiguous."

Cohen brought the deal before NEBF and was told to chase the deal and Cohen, considering that NEBF could not move quickly, accepted the lead role of deal maker. Cohen made an offer on the Complex of $105 million without the approval of NEBF. Kanne testified that he was unconcerned because he presumed Cohen was nonetheless making the offer on behalf of Westbard. Cohen made another offer in a letter of intent dated "October 1, 20004" [sic] without NEBF's approval of $110 Million that included a $5 million deposit and thirty-day due diligence period. Alfred thought that Cohen's offer was the best deal, even though it was at the low end of what Alfred

was willing to accept, because he thought Cohen held the rights to first offer and first refusal, which actually were held by Westbard.

Kanne testified that, when Cohen presented the offer and he saw that Cap Properties was the buyer, it did not concern him because he thought Cohen and Cap Properties were synonymous. The trial court found Kanne's testimony to be incredible. But it did so, in large part, for reasons that are inconsistent with our previously stated interpretation of the Agreement, *i.e.*, that section 5.1.4 prohibited any Cohen affiliate from engaging in a business that "relat[ed] to" Westbard. We explain.

Certainly, Cohen's purchase of the forty acre parcel, which *included Park Bethesda*, and his waiver of the Westbard's option (contained in its lease of Park Bethesda) was related to the business of Westbard, and therefore was prohibited by section 5.1.4. Yet the trial court considered Kanne's statement that he believed this is what the section meant, to be evidence of his untruthfulness:

> The Court finds Kanne's declaration that Cohen couldn't take the deal for himself under the terms of the Operating Agreement was no more than posturing by NEBF. Kanne knew or reasonably believed that statement was untrue. As before, he made the statement in an effort to gain additional leverage in the negotiations.

The court's fact-finding as to this point is clearly erroneous because we have held as a matter of law that, indeed, the interpretation that Kanne placed upon section 5.1.4 is correct. The trial court's finding that Kanne was not truthful was central to its conclusion that NEBF waived any right to object to Cohen's purchase of the forty acres because Kanne explicitly encouraged him to do so. See *Cont'l Ins. Co. v. Rutledge & Co., Inc.*, 750 A.2d 1219, 1240 (Del.Ch.2000) (holding that "one who has full knowledge of and accepts the benefits of a transaction may be denied equitable relief if he or she thereafter attacks the same transaction").

Accordingly, we shall vacate the circuit court's decision, and remand to that court for a new trial on the issue of whether NEBF waived, or is estopped from, objection to Cohen's purchase of the forty acres by its conduct. There was evidence that not only Jeff Kanne, but the Trustees of NEBF, knew of Cohen's behavior and acquiesced so as to have an opportunity to enter into another profitable endeavor with Cohen. There is also evidence that appellants encouraged the actions in order to put NEBF in a position to benefit from an endeavor with Cohen-controlled entities despite the Cohen entities' violation of the Agreement's prohibition against such activity. Whether the conduct of Kanne and NEBF constitutes waiver of Cohen's fiduciary duties under the Agreement must be determined by the trial court in light of our conclusion that the Westbard's Operating Agreement unambiguously permitted Cohen and Cohen-controlled affiliates to pursue investment opportunities *other than* those "relating to the Company," but prohibited pursuing investments "relating to the Company, *e.g.* Park Bethesda."

NEBF also challenges whether any waiver based on the conduct of its managing director for real estate, Jeff Kanne, could be effective, alleging that such conduct could not, because only the Trustees had authority to bind the Fund. The trial court should consider this question in light of agency principles and Section 2.6 of the Agreement, which expressly provides that only a Trustee is authorized to speak on behalf of NEBF. Finally, we remand the matter of the assignment of values to the individual parcels for reconsideration in light of our holding and rationale herein.

**JUDGMENT VACATED; CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**APPELLANTS TO PAY ONE–HALF COSTS AND APPELLEES TO PAY ONE–HALF COSTS.**