995 A.2d 721

**Carman DICKERSON, Personal Representative
of the Estate of Carter Bradley**

v.

**Ricardo LONGORIA, et al.**

**No. 74, Sept. Term, 2009.**

Court of Appeals of Maryland.

May 24, 2010.

422

424

Leah M. Nicholls (Institute for Public Representation Georgetown University Law Center, Deepak Gupta of Public Citizen Litigation Group, Stefan Shaibani of Law Firm of Stefan Shaibani, PLLC, Washington, DC), all on brief, for appellant.

John J. Murphy (D. Elizabeth Walker of Walker & Murphy, LLP, Rockville), on brief, for appellees.

Kelly Bagby, AARP Foundation Litigation, Michael Schuster, AARP, Washington, DC, brief of Amici Curiae AARP, Legal Aid Bureau, Inc., Maryland Disability Law Center, NCCNHR—The National Consumer Voice for Quality Long–Term Care and Voices for Quality of Care in support of appellant.

Monisha Cherayil, C. Matthew Hill, Public Justice Center, Baltimore, brief of Public Justice Center, Maryland Employment Lawyers Association, Maryland Consumer Rights Coalition, National Association of Consumer Advocates, and Civil Justice as Amici Curiae for appellant.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS, and BARBERA, JJ.

GREENE, J.

This case concerns a medical malpractice claim that the Estate of Carter Bradley ("the Estate")[1] filed against Heritage Care, Inc. ("Respondent"). We have been asked to determine whether the Estate may be required to arbitrate its claims against Respondent because of an arbitration agreement that Carman Dickerson ("Dickerson") allegedly signed on behalf of Carter Bradley ("Bradley") when Bradley was

---

1. Prior to Carter Bradley's ("Bradley") death, Carman Dickerson ("Dickerson") was, as explained in this opinion, Bradley's agent for purposes of making financial and health care decisions. Bradley died on February 4, 2005, and Dickerson was subsequently appointed the Personal Representative of his Estate on January 10, 2007.

admitted to Respondent's nursing home, the St. Thomas More Nursing and Rehabilitation Center ("St. Thomas More").[2] Prior to Bradley's death, Dickerson, who is now the personal representative of the Estate in this litigation, represented herself as Bradley's agent when she signed the arbitration agreement with Respondent. Respondent argues, and the trial court held, that Dickerson was, in fact, Bradley's agent for purposes of signing the arbitration agreement and that the Estate must submit its claims against Respondent to arbitration in accordance with that agreement. The Estate, on the other hand, contends that it is not bound by the arbitration agreement and supports this contention with a variety of arguments.

We shall decide this case by applying general agency principles to determine whether Bradley authorized Dickerson to sign the arbitration agreement on his behalf. Upon applying those principles, we agree with the Estate that it is not bound by the arbitration agreement because Dickerson did not have actual or apparent authority to bind Bradley to that agreement. The general rule is that one may delegate to another the right to make decisions on his or her behalf. Indeed, in this case there is evidence suggesting that Bradley gave Dickerson authority to make health care and financial decisions on his behalf. The decision to sign the arbitration agreement in this case was not, however, a health care or financial decision. Instead, it was primarily a decision to waive Bradley's right of access to the courts and his right to a trial by jury. On the basis of the record in this case, there is no evidence suggesting that Bradley authorized Dickerson to make this type of decision on his behalf or represented to Respondent that Dickerson had authority to do so. Accordingly, we reverse the trial court's judgment and hold that the Estate is not bound by the arbitration agreement.

---

2. There is no dispute that the arbitration agreement, if it applies, would require the Estate to submit its claims to arbitration.

## PROCEDURAL HISTORY

Respondent filed a petition in the Circuit Court for Montgomery County, seeking to compel the Estate to arbitrate the medical malpractice claims that the Estate had filed against Respondent.[3] Respondent asserted that the Estate was required to arbitrate those claims pursuant to the arbitration agreement that Dickerson signed when Bradley was admitted to St. Thomas More, arguing that Dickerson signed the agreement as Bradley's agent. The court conducted a one-day trial and held that Bradley, and subsequently Bradley's Estate, was bound by the arbitration agreement. The Estate noted a timely appeal of that ruling to the Court of Special Appeals, and, while the case was before the intermediate appellate court, the Estate petitioned this Court for a writ of certiorari. Before the Court of Special Appeals could issue an opinion in the case, we granted the Estate's petition. *Dickerson v. Longorio*, 409 Md. 46, 972 A.2d 861 (2009).

## FACTS

This case concerns the arbitration agreement that Dickerson signed when Bradley was admitted to Respondent's nursing home facility, St. Thomas More. The arbitration agreement purported to bind Bradley to arbitrate claims such as the one the Estate brought against Respondent. The parties do not dispute the facts as described by the trial court. Accordingly, we adopt those findings as follows, with citations and footnotes omitted:

---

**3.** The Estate, through Dickerson as the personal representative, initially filed its medical malpractice claims against Respondent and four physicians from St. Thomas More in the Maryland Health Care Alternative Dispute Resolution Office, as required by Maryland Code (1974, 2006 Repl. Vol.), § 3–2A–04 of the Courts and Judicial Proceedings Article. The Estate then waived arbitration, pursuant to § 3–2A–06B of the Courts and Judicial Proceedings Article, and filed its claims against Respondent, as well as Dr. Ricardo Longoria and Dr. Raman Tuli, physicians at St. Thomas More, in the Circuit Court for Prince George's County. The Prince George's County case is stayed pending the resolution of the present case.

[Bradley] suffered from a host of ailments including dementia, schizophrenia, organic brain disease, diabetes, mobility issues, and was unable to care for himself in an independent setting. Mr. Bradley lived with ... Ms. Dickerson, from sometime in 1997 to October, 2004. During this period, Ms. Dickerson frequently represented that she was Mr. Bradley's power of attorney and proceeded to make all necessary medical decisions for Mr. Bradley. For example, on July 12, 2004, Ms. Dickerson represented to HCR Manor Care that she was the designated "legal representative" for Mr. Bradley as well as his "legal guardian" with "durable power of attorney for health care/resident advocacy." On July 14, 2004, the nurse practitioner's notes indicated that the treatment plans for Mr. Bradley were discussed with Ms. Dickerson "POA," and again on September 29, 2004, Ms. Dickerson made the representation that she was Mr. Bradley's power of attorney, though there are notes in Mr. Bradley's Medical Records which indicate that there was a need to "clarify" Ms. Dickerson's legal status.

In October 2004, Ms. Dickerson planned to attend a family reunion and was unable to provide care for Mr. Bradley during her trip. The Veteran's Administration Medical Center ("Medical Center") provided Ms. Dickerson with a list of nursing homes where Mr. Bradley could stay in her absence. Mr. Bradley was aware that he would be staying for a short time at a nursing home and acquiesced to Ms. Dickerson's decision as to which nursing home he would reside.

On October 6, 2004, Ms. Dickerson, acting on behalf of Mr. Bradley, admitted him to Randolph Hills Nursing Home. Ms. Dickerson indicated that she was acting as Mr. Bradley's agent based upon her position "as financial power of attorney appointed by the Resident [Mr. Bradley]" and "as a family member or other person with authority to manage, use or control the Resident[']s income, funds and/or assets." While at the facility, Mr. Bradley was diagnosed with tuberculosis, a diagnosis which would later be retracted. Under the impression that Mr. Bradley had a severely

contagious disease, Ms. Dickerson made arrangements for him to be admitted to the Medical Center. Once it was explained that Mr. Bradley did not have tuberculosis, the medical notes indicate that Mr. Bradley . . . did not want to return to Ms. Dickerson's home.

The Medical Center transferred Mr. Bradley to St. Thomas More Nursing & Rehabilitation Center ("St. Thomas More") for physical therapy in order to increase Mr. Bradley's mobility. Ms. Dickerson discussed the move with Mr. Bradley, who agreed to be transferred. On the day that St. Thomas More admitted Mr. Bradley as a resident, Ms. Dickerson and Mr. Bradley did not discuss his admittance to the facility, but Ms. Dickerson testified that "Mr. Bradley just assumed that she would take care of [it]." Ms. Dickerson testified that she signed "a stack" of papers at the request of Isabel Torres (now Isabel Artega). A form entitled "Obligations of the Agent," was included in the papers that Ms. Dickerson signed. This form explained the responsibilities of an agent, and Ms. Dickerson signed it as Mr. Bradley's financial power of attorney.

The admittance papers also included a Resident and Facility Arbitration Agreement ("Agreement"), which is central to the claims in the case. Ms. Dickerson signed the Agreement on behalf of Mr. Bradley. The Agreement provided that any disputes between a resident and the facility shall be settled through arbitration, and "all claims based in whole or in part on the same incident, transaction, or related course of the care or service provided by the Facility to the Resident, shall be arbitrated in one proceeding." The agreement also stated that "the arbitrator will be selected by the Facility from a list of individuals who are certified in alternative dispute resolution or are retired judges who routinely offer their services as arbitrators," but also provided that the Agreement may be rescinded by written notice within fifteen (15) days.

In January, 2005, Mr. Bradley was transferred to Providence Hospital for emergency medical treatment. Ms. Dickerson did not actively participate in admitting Mr.

Bradley to Providence Hospital, but on January 22, 2005, she represented herself as Mr. Bradley's power of attorney and gave consent for elective transfusion of blood products. On January 27, 2005, Ms. Dickerson, once again, represented herself as Mr. Bradley's "legal custodian" in a phone conversation with the nurse transfer coordinator at Providence Hospital. Almost a month after Mr. Bradley was admitted to Providence Hospital, he passed away. During his lifetime, Mr. Bradley never executed any documents purporting to make Ms. Dickerson his power of attorney, though Ms. Dickerson readily admits that she was Bradley's fiduciary payee for purposes of endorsing and depositing his checks.

Based on these facts, the trial court determined that Bradley's Estate was required to arbitrate its claims against Respondent. First, the trial court rejected the Estate's argument that the Maryland Health Care Malpractice Claims Act ("Malpractice Claims Act"), Maryland Code (1974, 2006 Repl. Vol.), §§ 3–2A–01 through 3–2A–10 of the Courts and Judicial Proceedings Article, "provides the exclusive means by which medical malpractice claims may be pursued in Maryland. . . ." The court concluded that the Malpractice Claims Act "does not specifically preclude private arbitration as an alternative to a jury trial in the circuit court." Second, the trial court rejected the Estate's argument that Dickerson was not Bradley's agent for purposes of signing the arbitration agreement. The court found that "[t]here is . . . credible evidence to prove that Mr. Bradley not only knew that Ms. Dickerson acted on his behalf, but more importantly, he expected her to act for him and acquiesced to her decisions." Accordingly, the court concluded that "Ms. Dickerson signed the . . . arbitration agreement while acting as Mr. Bradley's agent" and that Bradley's Estate "will be bound by the arbitration agreement." Third, and finally, the court rejected the Estate's argument that the arbitration agreement was "unconscionable, and therefore, unenforceable, because it 'allows Heritage Care to unilaterally pick the arbitrator.' " The court noted that while the arbitration agreement "provides that an arbitrator

would be chosen from a list provided by Heritage Care," the agreement specified arbitrators who "would be bound by Maryland Rule 17–105, *et seq.*, as well as the Maryland Rules of Professional Conduct and, in the case of the [retired] judges, the Judicial Canons, dealing with impartiality." The court also noted that "the Agreement could be rescinded by written notice within fifteen (15) days, and it was never a condition for admittance into St. Thomas More." With these safeguards in place, the court concluded "that the arbitration agreement is not procedurally or substantively unconscionable."[4]

Subsequently, the Estate noted a timely appeal of the second and third rulings from the trial court. While the case was before the Court of Special Appeals, the Estate filed a petition for certiorari in this Court, asking us to answer the following questions:

1. Absent a power of attorney or other advance directive, does a friend or relative have authority to bind a nursing-home resident to an arbitration agreement included in the nursing-home-admission documents?

2. Is an arbitration agreement providing one party will unilaterally select the sole arbitrator from a list created by that party so one-sided as to be unenforceable?

After receiving briefs from both parties[5] and hearing oral arguments, we answer the first question in the affirmative. We conclude that neither a power of attorney nor any other advance directive is required to bind a nursing-home resident

---

**4.** The court also addressed whether Dr. Ricardo Longoria, Bradley's physician at St. Thomas More, was bound by the arbitration agreement. The claims against Dr. Longoria are not before us as he has withdrawn his portion of the appeal.

**5.** We also received two *amicus curiae* briefs, both in support of Petitioner. One brief was from the AARP; the Legal Aid Bureau, Inc.; the Maryland Disability Law Center; NCCNHR—The National Consumer Voice for Quality Long–Term Care; and Voices for Quality of Care. One brief was from the Public Justice Center, the Maryland Employment Lawyers Association, the Maryland Consumer Rights Coalition, the National Association of Consumer Advocates, and Civil Justice.

to an arbitration agreement included in nursing-home admission documents when, as in this case, signing the arbitration agreement is not a prerequisite to admission to the nursing home. We further conclude, however, that the arbitration agreement in this case is not binding on Bradley's Estate because, after applying general agency principles, we conclude that Dickerson did not have actual or apparent authority to bind Bradley to the arbitration agreement. As we conclude that Bradley's Estate is not bound by the arbitration agreement, we need not address the second question.

## DISCUSSION

### Standards of Review

The parties disagree as to the standard of review that we should apply to the issue of whether Dickerson was Bradley's agent for purposes of signing the arbitration agreement in this case. The Estate argues that we should apply a *de novo* standard because that is the standard we apply when the issue before us "involves an interpretation and application of Maryland statutory and case law." *Walter v. Gunter*, 367 Md. 386, 392, 788 A.2d 609, 612 (2002). Respondent argues, to the contrary, that we should apply the more deferential clearly erroneous standard because "[t]he existence of an agency relationship is a question of fact which must be submitted to the factfinder if any legally sufficient evidence tending to prove the agency is offered." *Faya v. Almaraz*, 329 Md. 435, 460, 620 A.2d 327, 339 (1993).[6]

Both parties have presented overly-narrow standards of review. This case involves both questions of fact and law. In such a case, we apply different standards of review to the questions of fact and to the questions of law. *See State Security v. American General*, 409 Md. 81, 109–11, 972 A.2d 882, 899 (2009) (explaining the application of different stan-

---

**6.** The parties agree that we would apply the *de novo* standard to the issue of whether the arbitration agreement in this case was unconscionable. We need not address that issue, however, because we conclude that the parties never entered into a valid arbitration agreement.

dards of review to different trial court determinations). One of our considerations is whether Dickerson was Bradley's agent for purposes of binding him to the arbitration agreement. This is a factual determination that we review using the clearly erroneous standard. *Faya,* 329 Md. at 460, 620 A.2d at 339. Under the clearly erroneous standard, we will not disturb the factual findings of the trial court "[i]f there is any competent evidence to support th[ose] factual findings." *Goff v. State,* 387 Md. 327, 338, 875 A.2d 132, 139 (2005) (quoting *Solomon v. Solomon,* 383 Md. 176, 202, 857 A.2d 1109, 1123 (2004)). As to questions of law, both parties have presented legal arguments based on their interpretation of statutory and case law. We consider those arguments *de novo;* in other words, we review the questions as a matter of law. *Goff,* 387 Md. at 337–38, 875 A.2d at 138. With these standards of review in mind, we turn to the substantive issues before us.

## Statutory Limitations

The Estate argues that Dickerson could not have been Bradley's agent for purposes of signing the arbitration agreement because of two Maryland health care statutes. First, the Estate asserts that under the Maryland Health Care Decisions Act ("HCDA"), Maryland Code (1982, 2009 Repl. Vol.), §§ 5–601 through 5–618 of the Health–General Article, an individual cannot become an agent for an incapacitated person unless a formal "advanced directive" has been executed in accordance with the statute. Second, the Estate argues that under § 19–344 of the Health–General Article, an agent for a nursing home resident may control only the resident's finances. Upon our review of these statutes, we conclude that neither statute prevented Dickerson from acting as Bradley's agent for purposes of signing the arbitration agreement in this case.

■ We first address the Estate's HCDA argument. As both parties point out, the HCDA provides procedures by which an individual may appoint someone to be his or her agent for purposes of making "health care decisions." *See*

§ 5–601(c) of the Health–General Article (defining "agent" under the HCDA). To this end, the HCDA provides procedures for creating an advance directive "regarding the provision of *health care* to [the] individual [who is to receive health care], or the withholding or withdrawal of *health care* from that individual." § 5–602(a) of the Health–General Article (emphasis added). An advance directive under the HCDA is either a "witnessed written or electronic document, voluntarily executed by the" individual who is to receive health care or a "witnessed oral statement" made by the individual who is to receive health care "in the presence of the attending physician or nurse practitioner and one witness" and "documented as part of the individual's medical record." §§ 5–601(b), 5–602(d) of the Health–General Article. Unless otherwise provided in the advance directive, the advance directive becomes effective when the individual to receive health care has been deemed, under procedures that the HCDA specifies, incapable of making an informed decision. § 5–602(e) of the Health–General Article.[7]

■ The Estate argues that the HCDA provides the only procedures by which an individual may appoint another person to be his or her agent for making health care decisions. Bradley did not create an advance directive appointing Dickerson his agent pursuant to the HCDA; the Estate therefore

---

7. The Health Care Decisions Act ("HCDA") also provides procedures by which a "surrogate decision maker" can be chosen to "make decisions about health care for a person who has been certified to be incapable of making an informed decision and who has not appointed a health care agent in accordance with this subtitle or whose health care agent is unavailable." Md. Code (1982, 2009 Repl. Vol.), § 5–605(a)(2) of the Health–General Article. An individual is "incapable of making an informed decision," when he or she is "unable to understand the nature, extent, or probable consequences of the proposed treatment or course of treatment, is unable to make a rational evaluation of the burdens, risks, and benefits or the treatment or course of treatment, or is unable to communicate a decision." § 5–601(m) of the Health–General Article. These procedures are not relevant to the present case as neither party contends that Bradley was incapable of making an informed decision. Indeed, the written medical evaluations performed during Bradley's admission to St. Thomas More describe him as "alert," "friendly," "cooperative," and "oriented."

argues that Dickerson did not have authority to sign the arbitration agreement on Bradley's behalf. We disagree for two reasons. First, the HCDA pertains only to "health care decisions," and, as we explain extensively later in this opinion, we disagree that the decision to sign the arbitration agreement in this case was a health care decision. For that reason, the HCDA does not apply to the present case. Second, even if we assume that the decision to sign the arbitration agreement were a health care decision, we disagree that the HCDA applies. The HCDA establishes procedures by which an individual may make health care decisions to be carried out if he or she is unable to make those decisions for him or herself. This intent is demonstrated by the HCDA's mandate that treatment may only be provided, withheld, or withdrawn pursuant to the HCDA if "the patient is incapable of making an informed decision regarding the treatment." § 5–606(a)(1) of the Health–General Article; *see also Wright v. Johns Hopkins Health*, 353 Md. 568, 577, 728 A.2d 166, 170 (1999) (explaining this requirement).[8] In such a case, the health care provider looks to the instructions provided in the patient's advance directive, § 5–602 of the Health–General Article, or, if no advance directive exists or the person designated as the decision maker in the advance directive is unavailable, the health care provider looks to a statutorily designated surrogate decision maker, § 5–605 of the Health–General Article. Nothing in the HCDA, however, restricts the ability of an individual to appoint a health care agent when, as in the present case, the individual who is to receive health care is apparently capable of making informed decisions on his or her own behalf.[9]

---

**8.** One commentator, Hon. John F. Fader II, has explained that the "threshold [of being 'incapable of making an informed decision'] must be reached before an advanced directive, appointment of a health care agent, or surrogate decisionmaking may become operative to govern health care decisionmaking." John F. Fader II, *The Precarious Role of the Courts: Surrogate Health Care Decisionmaking*, 53 Md. L.Rev. 1193, 1210–11 (1994).

**9.** In effect, the Estate argues that the HCDA entirely abrogates the common law of agency in regard to health care decisions. Nothing in

■ Next, we address the Estate's argument regarding § 19–344(c) of the Health–General Article. The Estate argues that pursuant to this statute, the authority of a nursing home resident's agent, when signing admission documents on the resident's behalf, can only extend to control of the resident's finances. Again, we disagree. As we have explained previously, the Legislature enacted § 19–344(c) to limit the personal liability that a nursing home resident's agent may incur when admitting the resident to a nursing home. *Walton v. Mariner Health,* 391 Md. 643, 654, 894 A.2d 584, 590 (2006). We provided an extensive discussion of § 19–344(c) in *Walton,* explaining the ways in which that statute limits the agent's potential liability by setting forth the specific requirements for those "who manage[ ], use[ ], or control[ ] the funds or assets that legally may be used to pay the applicant's or resident's share of costs or other charges for the facility's services." 391 Md. at 664–68, 894 A.2d at 596–99 (quoting § 19–344(c)(1) of the Health–General Article).[10] The Legislature's purpose in setting forth these requirements was to "assure that [health care contracts] conform to existing law and are clear and understandable" because "the circumstances surrounding admission to a nursing home are highly stressful for applicant[ ]s and their families." *Walton,* 391 Md. at 665, 894 A.2d at 597 (quoting Bill Summary, H.B. 683 at 1–2 (1988)). As our discussion in *Walton* points out, the purpose of § 19–344(c) was to limit the potential personal financial liability that

the statute suggests that it changes the common law in regard to the appointment of an agent to make health care decisions while the principal has the ability to make his or her own decisions. In that regard, the common law is undisturbed. *See Suter v. Stuckey,* 402 Md. 211, 232, 935 A.2d 731, 743 (2007) ("In construing a statute, it is a long-standing rule of statutory interpretation that the common law will not be repealed by implication.")

**10.** In addition to limiting the potential personal financial liabilities of nursing home residents and their agents, § 19–344 of the Health–General Article also sets forth a variety of procedures that health care facilities must follow to promote the interests and well-being of their residents. *See also* § 19–343 of the Health–General Article (setting forth the policies of the Nursing Home Bill of Rights, § 19–342 *et seq.* of the Health–General Article).

agents for applicants may incur during the stressful nursing home admission process.

The purpose and text of § 19–344(c) demonstrate that it is inapplicable to the present case. Section 19–344(c) was intended to limit the financial liabilities that the agent of a nursing home applicant or resident may be required to assume in regard to the applicant or resident's stay in the nursing home. It was not intended to limit the ability of an individual to authorize someone else to act on his or her behalf in other ways, nor is there anything in the statute that would have that effect. Of specific relevance to the present case, nothing in § 19–344(c) addresses arbitration agreements or limits the authority of a nursing home resident's agent in regard to such agreements. We therefore conclude that § 19–344(c), like the HCDA, did not preclude Dickerson from signing an arbitration agreement on Bradley's behalf.

### Other Jurisdictions

We now turn to the Estate's contention that we should follow other jurisdictions that have established procedures, outside of general agency principles, that an individual must follow when conferring on another person the authority to make health care decisions on the individual's behalf. The Estate makes two arguments in support of this contention. First, the Estate contends that the statutes of other states "[t]ypically ... require that the [nursing home] resident be certified, in writing as 'incapable of making an informed decision about treatment' by the attending physician." Second, the Estate argues that other state courts have held that, "absent a written advance directive, properly applied statutory procedures for appointing a decisionmaker, or some other clear signal from the resident that the family member had the authority to act on his or her behalf, arbitration agreements signed by a family member are not binding on the resident." To the extent that the Estate relies on those authorities to argue that we should look beyond general agency principles to make our determination in this case, we disagree. We do agree, however, with those courts that have applied general

agency principles in cases involving nursing home arbitration agreements.

First, we consider the Estate's arguments regarding statutes from other states and opinions applying those statutes. The statutes of other states reflect determinations made by those states' legislatures and are not, of course, binding on this Court. We need not consider the statutes that the Estate has cited for another reason as well: like the HCDA, the other statutes specifically apply to health care decisions. *See* Fla. Stat. Ann. § 765.204 (West 2005) (dealing with "health care decisions"); Miss.Code Ann. § 41–41–205 (2009) (same); Tenn. Code Ann. § 68–11–1803(d) (2006) (same).[11] As we explain extensively in this opinion, the decision to sign the arbitration agreement in this case was not a "health care decision." As a result, neither those statutes, nor cases applying those statutes, will influence our decision in this case.

Second, we consider the Estate's argument that other courts have applied something other than general agency principles when determining whether an individual has authority to sign an arbitration agreement on behalf of another person who is seeking health care. The Estate cites a number of Mississippi court decisions for this argument, but we disagree that any of those decisions are applicable to the present case. In each of those decisions, the courts applied the Mississippi health care surrogacy statute, Miss.Code Ann. § 41–41–211, and determined that its requirements had not been satisfied. *Compere's Nursing Home, Inc. v. Estate of Farish,* 982 So.2d 382, 384 (Miss.2008) (finding that the requirements of Miss.Code Ann. § 41–41–211 were not satisfied); *Miss. Care Ctr. of Greenville, LLC v. Hinyub,* 975 So.2d 211, 217–18 (Miss.2008) (same); *Gren. Living Ctr., LLC v. Coleman,* 961 So.2d 33, 37 (Miss.2007) (same); *Forest Hill Nursing Ctr., Inc. v. McFarlan,* 995 So.2d 775, 779–81 (Miss. Ct.App.2008) (same). Similar to the Maryland health care

---

**11.** The Estate also cites § 5–606 of the Health–General Article to support this argument, but, as we have explained, that statute is inapplicable to the present case.

surrogacy statute, *see supra* note 7, § 41–41–211 allows a person to "make a health-care decision for a patient who is an adult or emancipated minor if the patient has been determined by the primary physician to lack capacity and no agent or guardian has been appointed or the agent or guardian is not reasonably available." Those cases applying § 41–41–211 are inapplicable here because the present case involves neither a "health-care decision" nor an individual who "lack[ed] capacity." To the extent that the Estate relies on those decisions for its argument that we should apply something other than general agency principles to the present case, we find those decisions unpersuasive.

We do, however, find persuasive those decisions wherein courts have applied general agency principles to determine whether an individual had authority to sign a nursing home arbitration agreement on behalf of another. For example, the intermediate appellate court in California has applied general agency principles to nursing home arbitration agreements in a number of cases. In *Warfield v. Summerville Senior Living, Inc.*, 158 Cal.App.4th 443, 448–49, 69 Cal.Rptr.3d 783 (2007), the court concluded that a husband had no authority to sign a nursing home arbitration agreement on behalf of his wife, even though his wife, who suffered from dementia, had failed to object to her husband acting on her behalf. The court found that there had been "absolutely no evidence of the wife's 'express or implied consent to have her husband act as her agent.'" *Id.* at 448, 69 Cal.Rptr.3d 783 (quoting *Flores v. Evergreen at San Diego, LLC*, 148 Cal.App.4th 581, 589, 55 Cal.Rptr.3d 823 (2007)). The California court came to a similar conclusion in both *Flores*, 148 Cal.App.4th at 586–89, 55 Cal.Rptr.3d 823 ("It was [the nursing home's] burden to show the validity of the arbitration agreement based on [the resident's] express or implied consent to have her husband act as her agent.... [T]he record is devoid of any such evidence."), and *Pagarigan v. Libby Care Ctr., Inc.*, 99 Cal. App.4th 298, 300–03, 120 Cal.Rptr.2d 892 (2002) ("[D]efendants failed to produce any evidence [that the resident's daughters] had authority to enter into an arbitration contract

on behalf of their mother . . . . ").[12] In each of those cases, the court applied general agency principles to determine whether the signatory to a nursing home arbitration agreement had authority to sign the agreement on behalf of another.

Recently, the Supreme Court of Nebraska also applied general agency principles to a dispute concerning a nursing home arbitration agreement that had been signed by someone other than the nursing home resident. In *Koricic v. Beverly Enters.-Neb., Inc.*, a man signed an arbitration agreement on behalf of his mother when she was admitted to a nursing home. 278 Neb. 713, 773 N.W.2d 145, 149 (2009). The son had previously signed medical authorizations for his mother, but he had taken action only based on his mother's directions and had never been granted power of attorney over her affairs. *Id.* at 148–89. The court concluded that "an agency relationship existed between [the mother] and [the son]" and that "as [the mother's] agent, [the mother] authorized [the son] to sign the required admission papers." *Id.* at 151. The court also concluded, however, that the son's "actual authority did not extend to signing an arbitration agreement that would waive [the mother's] right of access to the courts and to trial by jury," and that the facts of the case "preclude[d] [the nursing home] from relying on the doctrine of apparent authority." *Id.* at 151–52. The Nebraska court was able to resolve that case, which involved facts much like the present case, by applying general agency principles.

■ Other courts have applied general agency principles to cases involving nursing home arbitration agreements. The intermediate appellate courts in Georgia and Kentucky did so in *Ashburn Health Care Ctr., Inc. v. Poole*, 286 Ga.App. 24, 648 S.E.2d 430 (2007), and *Mount Holly Nursing Ctr. v. Crowdus*, 281 S.W.3d 809 (Ky.Ct.App.2008). In both of those cases, nursing homes argued that an arbitration agreement should bind an individual (or the individual's estate) when

---

12. As explained *infra* note 16, the California intermediate appellate court in those California cases also determined that the statutory authority to make health care decisions as an individual's next-of-kin does not include authority to sign an arbitration agreement.

someone else had signed the arbitration agreement. *Poole,* 648 S.E.2d at 432–33 (husband signed for wife); *Crowdus,* 281 S.W.3d at 811–12 (friend signed for friend). Both courts applied general agency principles and found that the signatories lacked authority to bind the other person to the arbitration agreement. *Poole,* 648 S.E.2d at 433 ("Simply put, Ashburn Health Care failed to establish that [the resident's husband] acted with actual or apparent authority in signing the arbitration agreement, thereby waiving his wife's litigation rights."); *Crowdus,* 281 S.W.3d at 813–15 (finding nothing to support apparent authority). In our opinion, the question posed in the present case, as in those cases from other jurisdictions, can be answered through the application of general agency principles. Accordingly, we conclude that we need only apply the law of agency to determine whether Dickerson had authority to bind Bradley to the arbitration agreement in the present case.

### Agency

■ We now turn to the application of general agency principles to the present case. The issue before us is whether the trial court was clearly erroneous when it found that Bradley conferred on Dickerson the authority to sign, on his behalf, the arbitration agreement in this case. The Estate argues that Bradley conferred some authority on Dickerson, but only the authority to receive and endorse Bradley's Veterans Administration benefit checks and to make some health care decisions on his behalf. Respondent argues that Bradley conferred on Dickerson a more general authority, which included the authority to bind him to the arbitration agreement. The trial court agreed with Respondent, but we disagree. We instead conclude that Dickerson was Bradley's agent for purposes of health care and financial decisions, but that the scope of this consensual relationship did not include the authority to bind Bradley to the arbitration agreement in this case.

■ The agency principles at issue in this case are straightforward. In an agency relationship, one person, the principal, can be legally bound by actions taken by another

person, the agent. An agency relationship is created when the principal confers actual authority on the agent. "Actual 'authority to do an act can be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account.'" *Citizens v. Maryland Indus.*, 338 Md. 448, 459, 659 A.2d 313, 318 (1995) (quoting Restatement (Second) of Agency § 26 (1958)). Actual authority "may be inferred from conduct, including acquiescence." *Anderson v. General Casualty*, 402 Md. 236, 247, 935 A.2d 746, 752 (2007). In the absence of actual authority, a principal can be bound by the acts of a purported agent when that person has apparent authority to act on behalf of the principal. "Apparent authority results from certain acts or manifestations by the alleged principal to a third party leading the third party to believe that an agent had authority to act." *Klein v. Weiss*, 284 Md. 36, 61, 395 A.2d 126, 140 (1978). We have explained, however, that "[i]t is nearly axiomatic that one dealing with an agent must use reasonable diligence and prudence to ascertain whether the agent acts within the scope of his powers." *P. Flanigan & Sons v. Childs*, 251 Md. 646, 654, 248 A.2d 473, 477 (1968).

An agent's power to bind the principal is confined by the authority that the principal has actually granted to the agent. In regard to either type of authority, "a statement made by an agent will not bind his [or her] principal until an agency is established and then only if the statement is within the scope of the agency." *Id.* For this reason, "[a]n agent cannot ... enlarge the actual authority by his [or her] own acts without some measure of assent or acquiescence on the part of his [or her] principal...." *Id.* (quoting *Brager v. Levy*, 122 Md. 554, 561, 90 A. 102, 104 (1914)).

### Scope of Actual Authority

The trial court in the present case concluded that Bradley had conferred on Dickerson actual authority "to alter Mr. Bradley's legal relations." The trial court's factual findings do not, however, support such a broad conclusion. The

trial court based its conclusion on its finding that Dickerson "signed and deposited [Bradley's] checks, admitted him to various hospitals and nursing homes, and even signed documents allowing for vaccinations and blood transfusions, all for ... Bradley's benefit." The trial court also noted that Dickerson "frequently represented that she was Mr. Bradley's power of attorney and proceeded to make all necessary medical decisions for Mr. Bradley" during the period from 1997 to October 2004. By way of example, the trial court noted a number of times during that time period when Dickerson designated herself as Bradley's "legal representative" or "power of attorney" [13] when dealing with various health care providers, including Respondent.

These facts do suggest that Bradley conferred on Dickerson—directly or through acquiescence—actual authority to make some decisions on his behalf. Most of the decisions, however, concerned Bradley's medical treatments or his admission into medical facilities. Other decisions that Dickerson made on Bradley's behalf concerned Bradley's finances. Indeed, on repeated occasions, Dickerson held herself out as Bradley's "financial power of attorney" or stated that she had "authority to manage, use or control [Bradley's] income, funds and/or assets." This limited range of acts performed on Bradley's behalf suggest that, at most, Bradley may have conferred on Dickerson the authority to make health care and financial decisions on his behalf, but no more than that.[14]

---

**13.** Neither party contends that Bradley actually executed a power of attorney in regard to Dickerson. A power of attorney is a "written document[ ] by which one party, a principal, appoints another as attorney-in-fact and confers upon the latter [*i.e.*, the agent] the authority to perform certain specified acts on behalf of the principal." *Figgins v. Cochrane,* 403 Md. 392, 415, 942 A.2d 736, 749–50 (2008). The power of attorney "delineates the extent of the agent's authority." *King v. Bankerd,* 303 Md. 98, 105, 492 A.2d 608, 611 (1985). Bradley could have certainly given Dickerson authority to sign the arbitration agreement on his behalf if he had executed a written power of attorney that granted Dickerson that authority, although such a power of attorney was not the exclusive way to grant that authority.

**14.** Dickerson's testimony supports the conclusion that, through acquiescence, Bradley gave her actual authority to make financial and medical

### Decision to Sign the Arbitration Agreement
### vs. Health Care Decision

If the Estate is to be bound by the arbitration agreement, the decision to sign the agreement must have been within the scope of the authority that Bradley conferred on Dickerson. The parties have focused on Dickerson's authority to make health care decisions on Bradley's behalf, so we shall determine whether the decision to sign the arbitration agreement was within that authority. We have explained previously that the decision to enter into an arbitration agreement primarily concerns the signatory's decision to waive his or her right of access to the courts and right to a trial by jury. *See Walther v. Sovereign Bank,* 386 Md. 412, 443, 872 A.2d 735, 754 (2005) (explaining that "the 'loss of the right to a jury trial *is a necessary and fairly obvious consequence* of an agreement to arbitrate' ")(quoting *Sydnor v. Conseco Fin. Servicing Corp.,* 252 F.3d 302, 307 (4th Cir.2001)). We have further explained that arbitration agreements "are standard not only in insurance contracts but in construction contracts, employment agreements, and a variety of other contracts." *Walther,* 386 Md. at 443–44, 872 A.2d at 754 (quoting *Meyer v. State Farm Fire and Cas. Co.,* 85 Md.App. 83, 91, 582 A.2d 275, 278–79 (1990)). Quite obviously, the decision to sign an arbitration agreement is not, in and of itself, a health care decision.[15] It may sometimes be related to a health care decision, as in the present case where the arbitration agreement was included with the admissions documents for a health care facility and

decisions on his behalf. At trial, Dickerson stated that Bradley "didn't have any objection" to her taking care of his financial arrangements. She also acknowledged that she was Bradley's fiduciary payee in regard to his Veterans Administration payments. In addition, Dickerson stated that although Bradley "didn't ask" her to help him with his medical decisions, she did sign the admissions documents when he was admitted to multiple health care facilities.

**15.** Respondent agrees that the decision to sign the arbitration agreement in this case was not a "health care decision." In its brief, Respondent states "[t]here is no dispute, nor does [the Estate] even attempt to allege, that signing a free-standing binding arbitration agreement was a 'health care decision' in this case."

would require arbitration of health care claims. Subject to the limitations we discuss below, however, the decision to sign an arbitration agreement is a decision concerning the legal rights of the parties to the agreement about how to resolve their legal disputes, not a health care decision.

Although we have never addressed this issue, other courts have drawn a distinction between a health care decision and a decision to sign an arbitration agreement, even where the arbitration agreement is related to a health care decision. In several cases involving health care facilities, the intermediate appellate courts in Colorado, Florida, Georgia, and Texas have concluded that the authority to make health care decisions on another's behalf does not constitute authority to sign an arbitration agreement on that person's behalf. *See Lujan v. Life Care Ctrs. of Am.*, 222 P.3d 970, 973–76 (Colo.Ct.App. 2009) (agreeing with other jurisdictions that have concluded that "a health care proxy's decision to agree to arbitrate is [not] a medical treatment decision"); *Blankfeld v. Richmond Health Care, Inc.*, 902 So.2d 296, 301 (Fla.Ct.App.2005) ("There is nothing in the [health care proxy] statute to indicate legislative intent that such a proxy can enter into contracts which agree to things not strictly related to health care decisions. In our opinion, a proxy is not authorized to waive the right to trial by jury...."); *Life Care Ctrs. of Am. v. Smith*, 298 Ga.App. 739, 681 S.E.2d 182, 185 (2009) (concluding that a "health care power of attorney did not give [a daughter] the power to sign away her mother's or her mother's legal representative's right to a jury trial"); *Tex. Cityview Care Ctr., L.P. v. Fryer*, 227 S.W.3d 345, 352 (Tex.Ct.App.2007) ("[N]othing in the medical power of attorney indicates that it was intended to confer authority ... to make legal, as opposed to health care, decisions ..., such as whether to waive [the] right to a jury trial by agreeing to arbitration of any disputes."). Those courts drew a distinction between making health care decisions and the decision to sign an arbitration agreement, even when an arbitration agreement is related to health care.[16]

---

**16.** Both parties have cited decisions from the intermediate appellate court in California in support of their arguments. That court has

In our view, however, there are circumstances upon which the decision to sign an arbitration agreement may be a health care decision. Courts in other jurisdictions have recently

issued decisions that are difficult to reconcile. In some cases, the court has concluded that an individual who has statutory authority to make health care decisions on behalf of another, from next-of-kin status, does not have authority to sign an arbitration agreement on that person's behalf. *Flores v. Evergreen at San Diego, LLC*, 148 Cal.App.4th 581, 590, 55 Cal.Rptr.3d 823 (2007) ("Although the Legislature has specifically conveyed authority over medical decisionmaking and enforcement of rights to family members, it has not conveyed authority over the arbitration decision to family members."); *Goliger v. AMS Props., Inc.*, 123 Cal.App.4th 374, 377, 19 Cal.Rptr.3d 819 (2004); *Pagarigan v. Libby Care Ctr., Inc.*, 99 Cal.App.4th 298, 302–03, 120 Cal.Rptr.2d 892 (2002) ("Defendants do not explain how the next of kin's authority to make medical treatment decisions for the patient at the request of the treating physician translates into authority to sign an arbitration agreement on the patient's behalf at the request of the nursing home."). In other cases, the court has concluded that an individual who has statutory authority to make health care decisions on behalf of another, from a health care power of attorney, does have authority to sign an arbitration agreement on that person's behalf. *Hogan v. Country Villa Health Services*, 148 Cal.App.4th 259, 262, 55 Cal.Rptr.3d 450 (2007) (holding that a health care power of attorney granted "the power to execute arbitration agreements when presented ... by the long-term health care facility as part of the package of admissions documents"); *Garrison v. Superior Court*, 132 Cal.App.4th 253, 264–67, 33 Cal.Rptr.3d 350 (2005) (holding that a health care power of attorney granted the power to make the decision "to utilize a health care facility which included an optional revocable arbitration agreement").

The difference motivating these two lines of cases is unclear. The California court has stated that there is a difference between the authority to make health care decisions as next-of-kin and the authority to make health care decisions pursuant to a power of attorney. *Garrison*, 132 Cal.App.4th at 265, 33 Cal.Rptr.3d 350. In *Garrison*, the court noted that, per statute, an agent under a health care power of attorney "may make health care decisions for the principal to the same extent the principal could." 132 Cal.App.4th at 265–66, 33 Cal.Rptr.3d 350 (citing Cal. Probate Code § 4683(a) (West 2009)). California statutory law, however, similarly authorizes an individual's next-of-kin "to make medical treatment decisions on behalf of a patient" if the patient is incapable of giving informed consent. Cal. Health & Safety Code, § 1418.8. The California court has not explained how these two grants of authority are substantially different, such that the former confers the authority to sign an arbitration agreement on behalf of another person while the latter does not. For the reasons discussed in this opinion, we find more persuasive those decisions in which that court has drawn a distinction between a health care decision and the decision to sign an arbitration agreement.

concluded that the decision to sign an arbitration agreement was not a health care decision, and they based that decision on the fact that signing the arbitration agreement was not a prerequisite to admission to a health care facility. In *Koricic*, as we noted earlier, the Supreme Court of Nebraska concluded that a son who had authority to sign health care documents on behalf of his mother did not have authority to sign an arbitration agreement on her behalf. 773 N.W.2d at 149–52. In reaching that decision, the court explained that the decision to sign the arbitration agreement was not within the son's authority because the agreement "was optional and was not required for [the mother] to remain at the [nursing home] facility." *Id.* at 151. Similarly, the Supreme Court of Mississippi concluded in *Hinyub* that the decision to sign an arbitration agreement is not a "health care decision" where the patient or his agent "was not required to sign the arbitration provision to admit [the patient] to the [health care facility]." 975 So.2d at 218. The Mississippi court drew a distinction between Hinyub's case and previous cases in which "the arbitration provision was an essential part of the consideration for the receipt of 'health care.'" *Id.* (citing *Covenant Health Rehab of Picayune, L.P. v. Brown*, 949 So.2d 732 (Miss.2007), and *Vicksburg Partners, L.P. v. Stephens*, 911 So.2d 507 (Miss.2005)).

 We agree with the reasoning of those courts. The decision to sign a free-standing arbitration agreement is not a health care decision if the patient may receive health care without signing the arbitration agreement. In such a case, the decision primarily concerns the legal rights of the patient with respect to resolving legal claims. If signing the arbitration agreement is necessary to receive health care, then the decision to sign the agreement is a health care decision because the receipt of health care depends on whether the patient agrees to arbitrate his or her claims. In that case, the decision to sign the arbitration agreement is effectively a decision about where and whether to receive health care, either from a facility that requires the patient to sign an

arbitration agreement, from a facility that does not impose such a requirement, or from no facility at all.[17]

We now turn to the decision to sign the arbitration agreement in the present case and whether that was a health care decision within the scope of Dickerson's authority to act on Bradley's behalf. As Respondent points out, the arbitration agreement in this case is a free-standing contract, separate from the agreement to admit Bradley to Respondent's facility. The arbitration agreement explicitly states that "the execution of this arbitration agreement is not a precondition to the furnishing of services to the Resident of the Facility." Indeed, Bradley or his authorized agent presumably could have refused to sign the arbitration agreement without any effect whatsoever on Bradley's health care. Thus, the decision to enter into the arbitration agreement was not a health care

---

17. We recognize that our decision in this case may appear to encourage health care providers, seeking to resolve potential disputes with patients through arbitration, to require that all patients sign arbitration agreements as a precondition to the patients receiving treatment or services. This opinion is not intended to encourage or discourage the use of arbitration agreements as a precondition to the receipt of health care. Although we do not reach the question of unconscionability in this case, the practice of health care providers requiring that prospective patients agree to arbitration as a condition to receiving health care services may lead to costly legal challenges that those agreements are unconscionable. *See Holloman v. Circuit City*, 391 Md. 580, 603, 894 A.2d 547, 560–61 (2006) ("[I]n the ordinary case, when a party who enjoys greater bargaining power than another party presents the weaker party with a contract without a meaningful opportunity to negotiate, oppression and, therefore, procedural unconscionability, are present." (quotations and citations omitted)). *But see Walther v. Sovereign Bank*, 386 Md. 412, 430, 872 A.2d 735, 746 (2005) ("A contract of adhesion is not automatically deemed *per se* unconscionable.").

In addition, some states other than Maryland have passed statutes prohibiting such a requirement. *See* Alaska Stat. § 09.55.535 (2008) (stating that execution of an arbitration agreement "may not be made a prerequisite to receipt of care or treatment by the health care provider"); Colo.Rev.Stat. § 13–64–403 (West 2005) ("No health care provider shall refuse to provide medical care services to any patient solely because such patient refused to sign ... an [arbitration] agreement."); 710 Il. Comp. Stat. Ann. 15/8 (West 2007) (stating that an arbitration agreement may not be "a condition to the rendering of health care services by any party" and must be "a separate instrument complete in itself and not a part of any other contract or instrument").

decision; instead, it primarily concerned Bradley's waiver of his right of access to the courts and his right to a trial by jury. There is no evidence suggesting that Bradley conferred on Dickerson the authority to waive Bradley's right of access to the courts and right to a jury by signing an arbitration agreement on his behalf. Accordingly, we conclude that Dickerson did not have actual authority to sign the arbitration agreement.

Even if we assume that Dickerson held herself out as Bradley's agent for purposes of general legal decisions, our decision would be the same. The trial court and Respondent both placed significant weight on the fact that Dickerson signed documents on Bradley's behalf. As we have explained, however, an agent cannot extend his or her own authority beyond the authority granted to him or her by the principal. *P. Flanigan*, 251 Md. at 654, 248 A.2d at 477. The fact that Dickerson referred to herself as Bradley's "legal power of attorney" does not expand her authority, absent some evidence that Bradley authorized this statement, adopted it, or acquiesced to it. The fact that Dickerson signed the arbitration agreement at issue in this case certainly does not alter Dickerson's authority, as there is no evidence suggesting that Bradley authorized Dickerson to make this type of decision on his behalf.[18] Furthermore, the evidence suggests that Bradley was unaware that Dickerson had signed the arbitration agreement on his behalf when he was admitted to St. Thomas More, so he never had an opportunity to object to that action. It also appears that Respondent took no action to determine whether Dickerson actually had authority to sign the arbitration agreement on Bradley's behalf, which was Respondent's responsibility.[19] *Id.* Regardless of how she held herself out to

---

18. The record before us includes a number of admissions documents that Dickerson signed on Bradley's behalf when Bradley was admitted to other health care facilities. None of these admissions documents included arbitration agreements, so they do not suggest that Bradley had previously authorized Dickerson to sign arbitration agreements on his behalf, either expressly or impliedly.

19. There is no dispute that Bradley was out of the room when Dickerson signed the arbitration agreement. There is also no evidence sug-

others, Dickerson could not expand her own authority and bind Bradley to the arbitration agreement.

### Apparent Authority

There is also no evidence suggesting that Dickerson had apparent authority to act on Bradley's behalf. Nothing in the record suggests that Bradley ever represented to Respondent that Dickerson had the authority to waive his right of access to the courts and right to a trial by jury by signing an arbitration agreement on his behalf. Indeed, as we have explained, there is no evidence suggesting that Bradley was ever aware of the arbitration agreement that Dickerson signed when Bradley was admitted to St. Thomas More. Accordingly, Respondent cannot establish that Dickerson had apparent authority to act on Bradley's behalf. Applying general agency principles to the case before us, we conclude that Dickerson did not have the authority to bind Bradley to the arbitration agreement in this case.[20] As a result, the Estate cannot be required to arbitrate its claims against Respondent.

---

gesting that Bradley was ever aware of the agreement. At trial, counsel for the Estate asked the admissions coordinator at St. Thomas More whether Bradley "did ... or said [anything] to indicate to [her] that [ ] Dickerson had a power of attorney." The coordinator responded that Bradley had not said anything about that matter "at the date of admission." She explained that she and a social worker had talked to Bradley subsequently about whether Dickerson was his "power of attorney" and that Bradley had agreed that Dickerson was. There was no further clarification as to what Bradley considered to be the scope of Dickerson's power of attorney, nor did the coordinator suggest that Bradley was ever made aware of the arbitration agreement or that he had ever given Dickerson authority to bind him to such an agreement. The coordinator also stated that she never contacted Dickerson after the admissions process to ask her for a written power of attorney.

**20.** Respondent argues that a number of decisions from other jurisdictions support a contrary result to the one we reach in this opinion. Most of those decisions stand for the proposition that courts may uphold health care arbitration agreements. *See Briarcliff Nursing Home, Inc. v. Turcotte*, 894 So.2d 661 (Ala.2004) (holding that an arbitration agreement was not unconscionable and that the decedent's estate was bound to the agreement); *Estate of Etting v. Regents Park at Aventura, Inc.*, 891 So.2d 558 (Fla.Dist.Ct.App.2004) (holding that a blind woman could sign an arbitration agreement); *Gainesville Health*

## *Respondent's Other Contentions*

Respondent has presented three additional arguments why the Estate should be bound to the arbitration agreement in this case. First, Respondent argues that the Estate is bound by the arbitration agreement as a third-party beneficiary of that agreement. Second, Respondent contends that the principle of equitable estoppel should bind the Estate to the arbitration agreement. Third, Respondent asserts that the doctrine of unclean hands should bind Petitioner to the arbitration agreement. Each of these arguments misses the mark.

---

*Care Ctr., Inc. v. Weston,* 857 So.2d 278 (Fla.Dist.Ct.App.2003) (holding that an arbitration agreement was not unconscionable); *Wilkerson v. Nelson,* 395 F.Supp.2d 281 (M.D.N.C.2005) (holding that there was consideration and mutual assent to support an arbitration agreement and that the agreement was binding on family members); *Vicksburg Partners, L.P. v. Stephens,* 911 So.2d 507 (Miss.2005) (holding that an arbitration agreement was not unconscionable). We agree with the general proposition that courts may uphold nursing home arbitration agreements under proper circumstances. Those decisions are otherwise irrelevant to the present case because none of them address the issue before this Court: whether an individual conferred on another person the authority, actual or apparent, to sign an arbitration agreement on the individual's behalf.

Respondent has cited other decisions in which courts have concluded that an individual may sign an arbitration agreement on behalf of another, but those decisions are easily distinguishable from the present case. *Carraway v. Beverly Enters. Ala., Inc.,* 978 So.2d 27 (Ala.2007) (holding that a woman's lack of incompetence did not prohibit her brother from signing an arbitration agreement on her behalf); *Owens v. Coosa Valley Health Care, Inc.,* 890 So.2d 983 (Ala.2004) (holding that there was authority to sign an arbitration agreement when a mother, who was aware of the agreement, did not object to her daughter signing the agreement on her behalf); *MN MedInvest Co., L.P. v. Estate of Nichols,* 908 So.2d 1178 (Fla.Dist.Ct.App.2005) (holding that a mother could sign an arbitration agreement on behalf of her minor daughter under the doctrine of necessities); *Broughsville v. OHECC, LLC,* 2005–Ohio–6733, at ¶ 11–12, 2005 WL 3483777 (Ct.App.2005) (holding that a mother gave apparent authority to her daughter to sign an arbitration agreement on her behalf when she was in the room when the agreement was signed); *Owens v. Nat'l Health Corp.,* 263 S.W.3d 876, 884 (Tenn.2007) (holding that a health care power of attorney authorized the signing of an arbitration agreement that was "necessary to 'consent . . . to health care' " (quoting Tenn.Code Ann. § 34–6–201(3) (2007))).

The Estate cannot be bound by the arbitration agreement as a third-party beneficiary. The first problem with Respondent's argument on this point is that there was no arbitration agreement formed to which the Estate could be a third-party beneficiary. An individual is a third-party beneficiary to a contract if "the contract was intended for his [or her] benefit" and "it ... clearly appear[s] that the parties intended to recognize him [or her] as the primary party in interest and as privy to the promise." *Shillman v. Hobstetter,* 249 Md. 678, 687, 241 A.2d 570, 575 (1968) (quoting *Marlboro Shirt Co. v. Am. Dis. Tel. Co.,* 196 Md. 565, 569, 77 A.2d 776, 777 (1951)). Despite the fact that a third-party beneficiary is not a party to the contract, he or she can bring suit to enforce the contract. *Shillman,* 249 Md. at 687, 241 A.2d at 575. Before one can enforce a contract, however, whether as a party to the contract or as a third-party beneficiary, there must be a contract to enforce. Respondent in this case sought to enter into an arbitration agreement with Bradley, but, as we have explained, Bradley and Respondent never formed such an agreement.[21] Respondent therefore cannot be the third-party beneficiary of this non-existent agreement.

Even if the Estate were a third-party beneficiary to the arbitration agreement, the Estate would not be bound to arbitrate its claims against Respondent. As the Court of Special Appeals has explained in previous cases, a third-party beneficiary who sues to enforce a contract is bound by an arbitration agreement in that contract. *Westbard v. Westwood,* 181 Md.App. 37, 51, 954 A.2d 470, 478 (2007) ("[A] third-party beneficiary who sued for breach of a contract to which it was not a signatory [is] bound by the arbitration clause

---

**21.** Respondent seems to argue that Bradley, and therefore his Estate, was a third-party beneficiary of an arbitration agreement between Respondent and Dickerson. This cannot be correct. There is nothing suggesting that Respondent entered into such an agreement with Dickerson. Furthermore, Respondent is apparently arguing that Bradley was a third-party beneficiary of an arbitration agreement between Respondent and Dickerson, while simultaneously arguing that the very same agreement was actually between Respondent and Bradley. This inconsistency belies Respondent's arguments.

contained therein."); *Dist. Moving & Stg. v. Gardiner & Gardiner*, 63 Md.App. 96, 104, 492 A.2d 319, 323 (1985) ("[W]here a third party beneficiary attempts to sue a promiser, that promisor may apply the contract provisions against the third party beneficiary in the same manner available against the original promisee."), *aff'd sub nom. District Moving & Stg. v. Fedco Systems*, 306 Md. 286, 508 A.2d 487 (1986) (*per curiam* ). This is because a third-party beneficiary takes the contract "subject to the same defenses against the enforcement of the contract, as such, as exist between the original promisor and promisee." *Jones v. Hyatt*, 356 Md. 639, 647–48, 741 A.2d 1099, 1103 (1999) (quoting *Shillman*, 249 Md. at 690, 241 A.2d at 577). The Court of Special Appeals has also explained, however, that a third-party beneficiary to an arbitration agreement cannot be required to arbitrate a claim unless the third party is attempting to enforce the contract containing the arbitration agreement. *Hartford v. Scarlett Harbor*, 109 Md.App. 217, 292–93, 674 A.2d 106, 143 (1996) (refusing to require the plaintiff to arbitrate its contract claim against the defendant when the plaintiff was a third-party beneficiary to a different contract with the defendant), *aff'd*, 346 Md. 122, 695 A.2d 153 (1997). In this case, the Estate is not attempting to enforce a contract that includes an arbitration clause, but is instead suing Respondent for tort claims unrelated to the alleged contract between Bradley and Respondent. The third-party beneficiary argument is inapplicable here.

■■■■ Similarly, the Estate cannot be bound to the arbitration agreement by equitable estoppel. We have explained that "[t]he basis of equitable estoppel is the effect of the conduct of one party on the position of the other party" and that "[t]he estopped party is therefore 'absolutely precluded both at law and in equity, from asserting rights which might perhaps have otherwise existed ... against another person, who has in good faith relied upon such conduct....'" *Creveling v. GEICO*, 376 Md. 72, 101–02, 828 A.2d 229, 246 (2003) (quoting *Cunninghame v. Cunninghame*, 364 Md. 266, 289, 772 A.2d 1188, 1201 (2001) (internal quotations omitted)). To

assert equitable estoppel, the asserting party "must have been misled to his [or her] injury and have changed his [or her] position for the worse, having believed and relied on the representations of the party sought to be estopped." *Creveling,* 376 Md. at 102, 828 A.2d at 246 (quoting *Rubinstein v. Jefferson Nat'l Life,* 268 Md. 388, 393, 302 A.2d 49, 52 (1973)). Based on this theory, Respondent argues that the Estate should be estopped from avoiding the arbitration agreement in this case because Dickerson "executed the arbitration agreement and ... [Respondent] felt confident that the parties entered into a binding and enforceable arbitration agreement."

Respondent's argument suffers from two flaws. First, we see no way—and Respondent has not asserted any ways—in which Respondent has changed its position for the worse based on Dickerson's assertion that she was acting on Bradley's behalf when she signed the arbitration agreement.[22] This is a necessary component of an equitable estoppel defense. *Creveling,* 376 Md. at 101–02, 828 A.2d at 246. Second, and more importantly, Respondent is attempting to use equitable estoppel against Bradley's Estate based on actions that Dickerson took in her individual capacity. The fact that Dickerson is now the personal representative for Bradley's Estate is of no moment; we will not hold this circumstance against Bradley's Estate. Simply put, Bradley's Estate is the plaintiff in this case, and Respondent has alleged no conduct on the part of Bradley's Estate, or by Dickerson in her capacity as Personal Representative of Bradley's Estate, that has affected Respondent's position. This, too, is a necessary element of an equitable estoppel defense. *Id.* As a result, Respondent's equitable estoppel argument fails.

---

**22.** Perhaps Respondent could argue that it changed its position for the worse when it admitted Bradley to St. Thomas More, believing that Respondent and Bradley had entered into an arbitration agreement. This argument would fail because, as we have explained, the arbitration agreement was not a precondition to Bradley's admission to St. Thomas More.

Finally, the Estate cannot be bound to the arbitration agreement by the doctrine of unclean hands. We explained this equitable doctrine in *Wells Fargo v. Neal:*

The [un]clean hands doctrine states that "courts of equity will not lend their aid to anyone seeking their active interposition, who has been guilty of fraudulent, illegal, or inequitable conduct in the matter with relation to which he seeks assistance." *Hlista [v. Altevogt],* 239 Md. [43,] 48, 210 A.2d [153,] 156 [ (1965) ]; *see also Hicks v. Gilbert,* 135 Md.App. 394, 400, 762 A.2d 986, 989–90 (2000). The doctrine does not mandate that those seeking equitable relief must have exhibited unblemished conduct in every transaction to which they have ever been a party, but rather that the particular matter for which a litigant seeks equitable relief must not be marred by any fraudulent, illegal, or inequitable conduct. *Hlista,* 239 Md. at 48, 210 A.2d at 156; *Hicks,* 135 Md.App. at 400–01, 762 A.2d at 990 ("There must be a nexus between the misconduct and the transaction, because '[w]hat is material is not that the plaintiff's hands are dirty, but that he dirties them in acquiring the right he now asserts.'") (quoting *Adams v. Manown,* 328 Md. 463, 476, 615 A.2d 611, 617 (1992)).

398 Md. 705, 729–30, 922 A.2d 538, 552–53 (2007). The unclean hands doctrine is inapplicable in this case for the same reason as Respondent's equitable estoppel claim: the petitioner in this case is Bradley's Estate, but Respondent has alleged no improper conduct on behalf of Bradley's Estate or Dickerson in her capacity as Personal Representative of the Estate. There is no allegation that Bradley's Estate or its agent has committed inequitable conduct, nor that Bradley's Estate or its agent has committed fraudulent or illegal conduct.[23] Some

---

23. Respondent notes that Dickerson is "the heir of [Bradley's] Estate," suggesting that we should apply the doctrine of unclean hands because Dickerson may benefit if the Estate's claims against Respondent are successful. We decline to do so. First, as we have explained, we will not hold against the Estate acts that Dickerson may have performed in her individual capacity. Second, the Estate may well have other

conduct of this sort is required before a court may apply the doctrine of unclean hands. *Wells Fargo*, 398 Md. at 729–30, 922 A.2d at 552–53. Accordingly, the doctrine of unclean hands does not apply to the present case.

## CONCLUSION

The decision to enter into the arbitration agreement in this case primarily involved a decision to waive Bradley's right of access to the courts and right to a trial by jury. There was no evidence, however, to support the trial court's finding that Bradley authorized Dickerson to waive those rights. Bradley may have conferred upon Dickerson the power to act on his behalf in regard to medical decisions and financial decisions, but he conferred no more authority. As a result, we conclude that the trial court was clearly erroneous when it found that Dickerson had the authority to bind Bradley to arbitration in this case. The Estate therefore cannot be compelled to arbitrate its claims against Respondent.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY RESPONDENT.**

---

beneficiaries or creditors. We will not hold Dickerson's individual acts against these other entities for the same reasons.