Circuit Court for Montgomery County
Case No. 128270

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1900

September Term, 2016

_____

IBRAHIM BROWN

v.

STATE OF MARYLAND

_____

Nazarian,
Friedman,
Harrell, Glenn T., Jr.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Nazarian, J.

_____

Filed:  September 27, 2017

While breaking into a house in Silver Spring, Ibrahim Brown injured his hand and left a smudge of blood on the inside of a basement window. The police investigating the case sent a sample of the blood for comparison against the FBI's DNA database. Mr. Brown's blood sample matched two records of Mr. Brown's DNA from samples collected in Washington, D.C. The D.C. samples were collected legally under District law, but their collection would not have complied with the Maryland DNA Collection Act (the "Act") if collected here.

Mr. Brown was tried in a bench trial in the Circuit Court for Montgomery County and convicted of first-degree burglary and theft. He argues on appeal that DNA samples that would be illegal if collected in Maryland should be excluded under the Act, even if they were collected legally in another jurisdiction. He contends as well that the evidence was insufficient to support his convictions. We disagree with both sets of arguments and affirm.

## I.  BACKGROUND

Chris Holleyman returned to his home in Silver Spring on August 16, 2014 to discover that his home had been burgled. He noticed that his basement window had been opened and that there was a smudge of blood on the inside of the window. He testified at trial that approximately $12,000 of belongings had been stolen, including a bicycle he kept in the basement. He testified as well that the deadbolt on the exterior door of the basement, which he always left in the locked position, was unlocked when he returned home that evening.

Two police officers came to the house in response to Mr. Holleyman's 911 call. They took a sample of the blood smudged on the inside of the opened basement window. They cross-checked the sample against the FBI's DNA database, known as "CODIS" (the Combined DNA Index System). CODIS came back with two matches, both of which pointed to Mr. Brown. Both of the CODIS samples the window smudge matched had been collected in the District of Columbia: one for a prior conviction for misdemeanor sexual assault, the other from a separate investigation of first-degree sexual assault for which no charges were filed. Based on the match between the window smudge and the CODIS hits, the State obtained a warrant to take a buccal swab from Mr. Brown. The DNA from the swab matched the blood smudged on the window.

On October 22, 2015, the State indicted Mr. Brown on charges of first-degree burglary and theft between $1,000 and $10,000. On April 20, 2016, Mr. Brown filed a motion *in limine* to exclude all DNA evidence at trial. On May 13, 2016, the circuit court heard Mr. Brown's motion. He argued that because neither of the biologic samples underlying the CODIS DNA matches would have been eligible for collection and use under the Act had the alleged crimes occurred in Maryland, they could not form probable cause to take the buccal swab. The circuit court denied Mr. Brown's motion on May 19, 2016.

The circuit court conducted a bench trial on May 31 and June 1, 2016. Mr. Brown testified on his own behalf that he went to the Silver Spring house with an acquaintance after agreeing to "check [the house] out" in exchange for marijuana. He testified that he opened the basement window, got his fingers caught between the inside and outside windows (which caused him to bleed onto the window), but managed to pry his hand free

2

and close the window. He denied entering the house or stealing property. He claimed to have implored his partner to leave with him instead of entering the house, and then left.

The circuit court announced its findings and verdict from the bench on June 9, 2016. The court found the prosecution's witnesses (the two officers who responded to Holleyman's initial call, one of whom had specialized forensic training) a police fingerprint examiner, the detective assigned to the case, and two analysts from the DNA lab that analyzed Mr. Brown's DNA swabs) to be "very credible" and Mr. Brown to be "substantially less credible." The court stated that it did not believe Mr. Brown's testimony that he did not enter the home and was only there to "check out" the home. The court also found that Mr. Brown had entered the house with an intent to steal:

> [T]he defendant was inside the home in part at least for the upper part of his body to the point where he could have grabbed the . . . wall inside. I am persuaded beyond a reasonable doubt that by having made the arrangement that he did with [his accomplice], by having looked inside the home, by having seen a bicycle and because of all of the evidence generally that h[is] inten[t], was in fact to ste[a]l.

The trial court's findings included two comments about Mr. Brown seeing a bicycle in the house from outside of the breached window, and one comment about Mr. Brown testifying about seeing the bicycle from outside of the house. But although Mr. Brown did say at one point that he "took a couple of looks [into the window] to see if anybody was in there and it was real dark," at no point during the trial did he actually testify to having seen a bicycle.

Before announcing the verdict, the court expressed doubt that Mr. Brown was the person who actually removed the stolen items from the house. But the court explained that

3

even if he didn't physically remove the items from the house, he still was liable as an accomplice:

> [T]he defense claimed that the defendant closed the window. . . .
>
> We went back and listened very carefully to the testimony. That was not the case from what I could tell. My understanding is what happened outside on the street is what I've already said. That [Mr. Brown] told [his accomplice] that the window was open.
>
> . . . I don't think the defendant did enough to eliminate himself from the criminal venture to have avoided accomplice liability.
>
> . . . And so, for that reason that will be, that will be my finding.

The circuit court found Mr. Brown guilty of first-degree burglary and theft. Mr. Brown filed a timely appeal. We include additional details in the discussion as necessary.

## II. DISCUSSION

Mr. Brown raises two groups of arguments on appeal.[1] *First,* he claims that the circuit court erred by denying his motion to exclude DNA evidence. He reprises the

---

[1] Mr. Brown phrased the Questions Presented in his brief as follows:

> 1. Did the circuit court err in denying Mr. Brown's motion in limine to exclude DNA evidence where probable cause to collect the evidence was based on DNA profiles from the District of Columbia that could not have been lawfully collected or uploaded to a DNA database by the State of Maryland?
>
> 2. Did the circuit court err in convicting Mr. Brown of first degree burglary and theft after the circuit court made erroneous factual findings regarding Mr. Brown's testimony,

4

argument he made in the circuit court, *i.e.*, that because the D.C. DNA samples on CODIS would not have been collectible under the Act, they could not form the basis of probable cause for the warrant compelling his matching sample in this case. *Second*, Mr. Brown argues that the circuit court erred by grounding his conviction on the erroneous findings that he saw a bicycle in the house and that he did not close the basement window. Without those findings, he contends, the evidence against him was insufficient to support his convictions.

The circuit court denied Mr. Brown's motion *in limine* to exclude the DNA evidence based on its interpretation of the Act. Where "both parties have presented legal arguments based on their interpretation of statutory and case law[,] [w]e consider those arguments *de novo*; in other words, we review the questions as a matter of law." *Dickerson v. Longoria*, 414 Md. 419, 433 (2010) (citation omitted). When reviewing a non-jury trial for the sufficiency of the evidence,

> the judgment of the [c]ircuit [c]ourt will not be set aside on the evidence unless clearly erroneous and due regard will be given to the opportunity of the lower court to judge the credibility of the witnesses. . . . [T]he findings of fact of the trial judge must be accepted unless there was no legally sufficient evidence or proper inferences therefrom, from which the court could find the accused guilty beyond a reasonable doubt.

*Dixon v. State*, 302 Md. 447, 450–51 (1985) (internal citations omitted). When reviewing bench trials, we review findings of fact under the "clearly erroneous" standard, meaning

---

incorrectly finding that (a) he testified he looked at a "bicycle" inside the victim's house and (b) he did not testify he closed the window to the house?

5

that "[a] finding of a trial court is not clearly erroneous if there is competent or material evidence in the record to support the court's conclusion." *Lemley v. Lemley*, 109 Md. App. 620, 628 (1996).

### A. The Maryland DNA Collection Act Did Not Preclude Legally Collected DNA Samples From Serving As Probable Cause.

Mr. Brown argues *first* that the circuit court erred by failing to suppress the DNA evidence that ultimately was admitted at trial. He contends that the Act prohibits admission of DNA evidence when the samples giving rise to probable cause for the matching sample could not have been collected legally in Maryland, even if they were collected legally under the laws of that jurisdiction. This is a question of first impression. We disagree with Mr. Brown that the statute operates as he contends.

Mr. Brown is right that neither of the samples giving rise to the CODIS hits linking him to the window smudge could have been collected and submitted to CODIS had the crime or alleged activities been committed in Maryland.[2] Section 2-504(a)(2) of the Public Safety Article ("PS") of the Maryland Code (2003, 2011 Repl. Vol., 2016 Supp.) authorizes law enforcement to collect DNA samples from people *convicted* of felonies, burglary in the fourth degree, and breaking and entering a motor vehicle. Section 2-504(a)(3)(i) permits collection from people *charged* with certain crimes, including burglary and attempted burglary:

---

[2] There is one nuance: Mr. Brown is correct if we assume that the underlying facts of his misdemeanor sexual assault conviction in Washington D.C. would have resulted in a misdemeanor, not a felony, conviction in Maryland.

In accordance with regulations adopted under this subtitle, a DNA sample shall be collected from an individual who is charged with:

> 1. a crime of violence[3] or an attempt to commit a crime of violence; or
> 2. burglary or an attempt to commit burglary.

Mr. Brown's D.C. misdemeanor sexual assault conviction does not fall into either of these categories. Nor does the sample underlying the other CODIS hit, which was taken in connection with a separate investigation for first-degree sexual assault that never led to charges. Everyone agrees, though, that both samples were collected and submitted to CODIS in compliance with District of Columbia law, and Mr. Brown does not challenge the constitutionality of the D.C. DNA law.

Mr. Brown argues, in essence, that DNA profiles on CODIS must be collected in a manner consistent with the Act to qualify as probable cause to compel a new sample in Maryland. If not, he says, the match should be excluded, even if the samples were collected legally elsewhere and submitted properly to CODIS. Neither the text nor the legislative history of the Act compels this result.

**1. The plain language and statutory scheme of the Act do not preclude reliance on CODIS hits from legal out-of-state samples.**

The Act is silent on the treatment of out-of-state samples, so Mr. Brown analogizes to the Maryland Electronic Surveillance Act ("MESA"), Md. Code (1974, 2013 Repl. Vol.) §§ 10-401 to 10-414 of the Courts & Judicial Proceedings Article ("CJ"), which precludes

---

[3] PS § 2-501(e) defines "crime of violence" to have the meaning stated in § 14-101 of the Criminal Law Article.

Maryland courts from admitting most wiretapped communications that violate the Maryland statute, even if they were obtained legally elsewhere. In *Mustafa v. State*, the case on which Mr. Brown relies most heavily, the tape recording at issue was obtained lawfully under District of Columbia law, but "would not have been lawful had it been made [under MESA]." 323 Md. 65, 71–72 (1991). Ultimately, the Court of Appeals held that the statute's exclusionary provision barred admission of the tape recordings in Maryland courts because they did not satisfy the two-party consent rule contained in MESA and that governs recordings in Maryland. *Id.* at 75–76. The Court reasoned that "the provisions of [MESA] constitute a declaration of the public policy of this State," and that although "Maryland may not ordinarily proscribe conduct occurring outside its boundaries," it "[q]uite plainly . . . may regulate the admissibility of evidence in its courts." *Id.* at 74–75.

This analogy doesn't hold here, though, for two reasons. *First*, the language and structure of MESA and the Act reveal differences in legislative intent. Unlike the Act, MESA specifically ties the admissibility of recordings to compliance with Maryland law:

> Any investigative or law enforcement officer . . . who has lawfully received any information concerning a wire, oral or electronic communication or evidence lawfully derived therefrom, *which would have been lawful for a law enforcement officer of this State . . . to receive*, may disclose the contents of that communication or the derivative evidence while giving testimony . . . .

CJ § 10-407(f) (emphasis added). The Court of Appeals has described MESA's exclusionary rule as "all-encompassing." *Mustafa*, 323 Md. at 73–74 ("There is no indication that the legislature intended to adopt anything but the 'all-encompassing exclusionary rule which it unequivocally fashioned in [CJ] § 10-405.'" (quoting *Wood v.*

8

*State*, 290 Md. 579, 584 (1981))).  And MESA "precludes the admission of a communication intercepted, no matter where, under circumstances inconsistent with this State's substantive law." *Id.* at 75.

In contrast, the Act says nothing about the admissibility in Maryland courts of evidence legally collected extraterritorially.  The Act's expungement provision is tailored narrowly and requires the destruction or expungement of DNA samples or records in only three specific instances: when a criminal action against the individual sampled does not result in a conviction, when a conviction is vacated or reversed, or when the individual has been pardoned.  PS § 2-511(a).  Indeed, the language of the expungement provision, which addresses "DNA samples and records generated as part of a criminal investigation," is limited only to samples and records generated *in Maryland*.  PS § 2-511.  And because samples and records can only qualify for expungement "from the State DNA data base," and extraterritorially-collected samples are never entered into Maryland's database, there is no statutory basis to prevent CODIS hits from establishing probable cause.  PS § 2-511(a).

*Second*, Mr. Brown's gloss on the Act would create serious practical problems.  *See CashCall, Inc. v. Md. Comm'r of Fin. Regulation*, 448 Md. 412, 431 (2016) ("In every case, the statute must be given a reasonable interpretation, not one that is absurd, illogical or incompatible with common sense." (quoting *Gardner v. State*, 420 Md. 1, 8–9 (2011))).  When determining whether a recording, regardless of its geographic origin, complies with MESA, a court in pre-trial hearing need only inquire about the factual circumstances of the recording—who made the recording and whether the parties consented to being recorded.

9

But CODIS reveals little to no information about the source of the sample or the circumstances under which it was taken. Reading the Act as Mr. Brown suggests would require law enforcement and the courts to determine independently, among other things, what crimes or charges underlay each sample and how that state's criminal code maps onto ours—whether, for example, their felonies would be felonies under Maryland law, whether a particular burglary elsewhere would qualify as a fourth-degree burglary in Maryland, or whether their crimes of violence are the same as ours. *See* PS § 2-504(a)(2)–(3) (listing crimes that qualify charges or convictions for DNA collection). Such an interpretation as urged by Mr. Brown would impair significantly the utility of CODIS and impose additional burdens on law enforcement in Maryland.

## 2.    The Act's legislative history confirms our reading.

Although we could affirm the circuit court's ruling on our plain language reading of the statute alone, we may still consult legislative history and surrounding circumstances "as a confirmatory process," *State v. Rice*, 447 Md. 594, 623 (2016) (internal quotation marks and citation omitted). The legislative history of the Act confirms our conclusions. The Act was passed on the heels of the federal DNA Identification Act of 1994, Pub. L. No. 103-322, which formalized the FBI's authority to establish CODIS and invited states to participate. *See State Police – Statewide DNA Database System and Repository: Hearing on S.B. 298 & H.B. 410 Before the S. Judicial Proceedings Comm. and the H. Judiciary Comm.*, 1994 Leg., 408th Sess. (Md. 1994) [hereinafter *Legislative Hearing Statement*] (statement of W. Kevin Hughes, Governor's Legislative Office, and Col. Larry

10

Tolliver, Superintendent, Md. State Police). The legislative history reveals the Act as having two related, but clearly separate, purposes. *First*, the Act was designed to establish a state-wide DNA database and to formalize the process through which DNA evidence would be collected and entered into it. The original House and Senate bills established the initial set of crimes that would qualify a suspect or convict for DNA collection, the people permitted to collect DNA evidence, the technical standards that each of the labs must meet, the circumstances under which the DNA evidence should be used, when DNA evidence should be expunged or destroyed, and the funding that would be necessary to ensure high-volume operation. *See, e.g.*, S. JUDICIAL PROCEEDINGS COMM., BILL ANALYSIS, H.B. 410, 408th Sess. (Md. 1994) [hereinafter BILL ANALYSIS].

*Second*, and always discussed separately from the first, the Act was designed to ensure that Maryland's collected DNA evidence and DNA laboratories would meet the federal, technical requirements for participation in CODIS. CODIS is mentioned in the legislative history only for this purpose and in short, check-the-federally-required-box style sentences. The Fiscal Note for HB 410 states that the bill requires the state police to "report DNA data to [CODIS,] operated by the Federal Bureau of Investigation." DEP'T OF FISCAL SERVS., FISCAL NOTE, H.B. 410, 408th Sess., at 2 (Md. 1994). The Senate's analysis of the House Bill states that the contents of the DNA database will be "made available to . . . agencies participating in the FBI's CODIS system." BILL ANALYSIS, at 1. The testimony about the bill before the Senate Judicial Proceedings Committee and the House Judiciary Committee on behalf of the Office of the Governor by the Superintendent of the Maryland State Police and a member of the Governor's Legislative Office reiterated that "[t]he

11

legislation ensures that Maryland will comply with and participate in the federal CODIS network." *Legislative Hearing Statement*, at 2.

The legislative history confirms, therefore, the purposes we see in the language and structure of the Act: the creation of a state DNA database, with procedures for DNA evidence collection in Maryland, and Maryland's participation in CODIS. Nothing in the Act's language or structure indicates that the Act was intended to regulate the admission of extraterritorially-collected DNA evidence, and the legislative history demonstrates that it wasn't on the General Assembly's mind at the time either. We affirm the circuit court's denial of Mr. Brown's motion *in limine* to exclude DNA evidence.

> **B.** **The Circuit Court Did Not Err When It Inferred That Mr. Brown Saw A Bicycle From Outside Of The House, Nor Did It Err When It Declined To Give Credence To Mr. Brown's Testimony.**

Mr. Brown contends *second* that the circuit court erred when it relied on testimony he never gave about seeing a bicycle inside the house to convict him, and that it erred when it declined to give weight to his exculpatory testimony. We disagree.

> **1.** **The circuit court did not commit clear error when it inferred that Mr. Brown saw the bicycle.**

Mr. Brown argues that in finding that he had the intent to steal, the court relied on the misimpression that he had testified about seeing a bicycle, and that without that "finding," the state failed to prove the intent element of the theft and burglary charges. He points to three comments the circuit court judge made in explaining why it found him guilty. *First*, the circuit court stated that Mr. Brown "testified that he looked inside the basement through this window and saw a bicycle." *Second*, the court stated that it was

12

"persuaded beyond a reasonable doubt that by having made the arrangement that he did with [his acquaintance], by having looked inside the home, by having seen a bicycle and because of all of the evidence generally that h[is] inten[t], was in fact to ste[a]l." A short while later, the court elaborated in a *third* comment that "I think his real intent and I infer from the fact that he looked at the bicycle [and] was there in the middle of the night, I think his real intent was to steal."

It's true that Mr. Brown never said, in those words, that he saw a bicycle. But the court actually said that Mr. Brown testified to seeing the bicycle once—the other two times, the court inferred that Mr. Brown had seen it. Inferred findings based on circumstantial evidence are subject to the same "clearly erroneous" standard of review as any other factual finding. "A finding of a trial court is not clearly erroneous if there is competent or material evidence in the record to support the court's conclusion." *Lemley*, 109 Md. App. at 628. And here, the circuit court's inference that Mr. Brown saw the bicycle is supported sufficiently.

There were two bicycles in the basement, both visible from the window Mr. Brown forced open. Mr. Brown testified to having spent time examining the windows to determine if they could be used for entry into the house. He testified that while he was examining the basement windows, he "took a couple of looks to see if anybody was in there and it was real dark." Mr. Holleyman, the homeowner, testified that there were two bicycles in the only room in the basement, and unlike other items in the basement, he did not testify that they were tucked away in some kind of less visible fashion. From this collection of testimony, the court could have drawn a rational connection between Mr.

13

Brown's admitted looks in the window and the taken bicycle that was in plain sight. We see no clear error in that inference.

**2.     The circuit court was free to disbelieve Mr. Brown's testimony that he closed the window before committing the burglary.**

Mr. Brown argues that the circuit court erred as well by "failing to recognize and consider [his] testimony that he closed shut the window to the [r]esidence," and that if it had considered his testimony properly, it would have found that he repudiated the crime and could not be guilty as an accomplice. Again, we discern no error.

A finder of fact is "free to believe part of a witness' testimony, disbelieve other parts of a witness' testimony, or to completely discount a witness' testimony." *Smiley v. State*, 138 Md. App. 709, 719 (2001) (citation omitted). In this case, the judge found that Mr. Brown lacked credibility, and didn't believe Mr. Brown's story that he was at the house only to "check it out" and not to commit the theft. After hearing all of the evidence and taking eight days to deliberate, the court found that "the defendant was inside the home in part at least for the upper part of his body to the point where he could have grabbed the . . . wall inside." And contrary to Mr. Brown's contention, the court did not imply that Mr. Brown *left* the window open—it implied only that Mr. Brown didn't open the window, immediately close it afterwards, change his mind about committing burglary, and thus repudiate the act.

14

There was more than enough evidence for a rational person to believe beyond a reasonable doubt that Mr. Brown committed burglary and theft. The court did not err in finding him guilty.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. APPELLANT TO PAY COSTS.**